UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN

JASON CANTRELL #397429,

     Plaintiff,                     NO. 1:18-cv-1163

v                               HON. GORDON J. QUIST

MICHIGAN DEPARTMENT OF        MAG. PHILLIP J. GREEN
CORRECTIONS, ANTHONY HEILIG,
and SCOTT ARP,

     Defendants.

_____

Dan Manville (P39731)        Josh Marcum (P68244)
Attorney for Plaintiff        Assistant Attorney General
Civil Rights Clinic           Attorney for MDOC Defendants
MSU College of Law         Michigan Department of Attorney General
P.O. Box 1570              MDOC Division
East Lansing, MI  48823     P.O. Box 30217
(517) 913-9690            Lansing, MI  48909
daniel.manville@law.msu.edu (517) 335-3055
                              Marcumj1@michigan.gov
_____/

# MDOC DEFENDANTS' BRIEF IN SUPPORT OF THEIR
# MOTION FOR SUMMARY JUDGMENT

Dana Nessel
Attorney General

Josh Marcum (P68244)
Assistant Attorney General
Attorney for MDOC Defendants
MDOC Division
P.O. Box 30217
Lansing, MI 48909
(517) 335-3055
Marcumj1@michigan.gov
P68244

Date:  September 28, 2020

## CONCISE STATEMENT OF ISSUES PRESENTED

1. To succeed on a First Amendment retaliation claim, Plaintiff must demonstrate that he suffered an adverse action that was motivated by conduct protected under the First Amendment.  Here, Plaintiff cannot establish that he was engaged in protected conduct and, even if he could, he cannot establish causation.  Are Defendants entitled to summary judgment?

2. A claim of Cruel and Unusual Punishment under the Eighth Amendment for excessive force requires proof of unnecessary and wanton infliction of pain.  Where Plaintiff cannot demonstrate that Defendants unnecessarily and wantonly inflicted pain upon Plaintiff, and where Defendants acted reasonably for the purpose of maintaining order, are Defendants entitled to summary judgment?

3. Government employees are entitled to qualified immunity in § 1983 actions unless they violated clearly established constitutional rights.  Defendants are government employees who acted reasonably under the circumstances and did not violate Plaintiff's clearly established constitutional rights.  Are Defendants entitled to qualified immunity?

## CONTROLLING OR MOST APPROPRIATE AUTHORITY

1. **First Amendment retaliation**: *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (The three elements of a retaliation claim are protected conduct, adverse action, and causation).

2. **Eighth Amendment Excessive Force:** The Eighth Amendment's proscription against cruel and unusual punishment prohibits "the unnecessary and wanton infliction of pain." *Hudson v. McMillan*, 503 U.S. 1, 5 (1992). "Among 'unnecessary and wanton' inflictions of pain are those that are 'totally without penological justification.'" *Whitley v. Albers*, 475 U.S. 312, 319 (1986). When prison officials use force to keep order, the core judicial inquiry is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson*, 503 U.S. at 6-7.

3. **Qualified Immunity**: *Pearson v. Callahan*, 555 U.S. 223 (2009) (The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known).

## STATEMENT OF FACTS

Plaintiff Jason Cantrell (Cantrell) is a prisoner currently confined in the Michigan Department of Corrections (MDOC) at Oaks Correctional Facility (ECF) in Manistee, Michigan.  In October of 2018, Cantrell filed a *pro se* complaint under 42 U.S.C. § 1983 in which he alleged claims of excessive force and retaliation.  (Compl., R. 1, PgID 3-4.)  During the period relevant to his claims, Cantrell was housed at Bellamy Creek Correctional Facility (IBC) in Ionia, Michigan.

On September 14, 2019, Cantrell, represented by counsel, filed a First Amended Complaint.  (Am. Compl., R. 40, PgID 153.)  The Amended Complaint alleges retaliation and excessive force against Anthony Heilig and Scott Arp, both of whom were corrections officers at IBC. (*Id*. at PgID 154.)  The claims are interrelated. Cantrell claims that he was assaulted in retaliation for requesting to speak to a supervisor about a cell search conducted by Heilig.  (*Id*. at PgID 158.)  That alleged assault is also the basis for his excessive force claim.  (*Id*.)  Cantrell also claims he was issued a misconduct ticket for assault in retaliation for asking to speak to a supervisor. (*Id*. at PgID 156.)

According to Cantrell, at approximately 7:15 p.m. on August 19, 2017, Heilig removed Cantrell and his cellmate from their assigned cell for the purpose of a cell search. (*Id*.)  When Cantrell returned to the cell, he claims that Heilig had "destroyed photographs of the Plaintiff's family members by ripping them up and scattering them across the cell floor" and "removed all of the Plaintiff's clothing from his wall locker and left them strewn across the cell floor as well as in the cell toilet." (*Id*. at 155.)  At deposition, Cantrell stated that, in addition to family pictures and clothing being

thrown in the toilet and scattered on the floor, everything was pulled out of his locker and placed on the floor, his bed and mattress was on the floor and his sheets were off the bed. (Defs.' Ex. A, Pl's Dep. 9:4-9:9.) According to Cantrell, these personal items were scattered across his "entire cell floor." (*Id*. at 34:15.)

Cantrell claims that he informed Heilig that he wanted to speak to a sergeant or shift command about the condition of his cell. (R. 40, PgID 155.) He claims that he kept insisting to speak to a supervisor. (Defs.' Ex. A at 12:16-12:23.) When his cell door was opened for medication lines, Cantrell exited the cell in attempt to summon a sergeant. (R. 40, PgID 155.) Cantrell was required to remain in his cell at that time, as only his cellmate was to receive medication. (Ex. A at 9:19-9:24.) However, when the door was opened for Cantrell's cellmate, Cantrell exited. (*Id*. at 9:19-10:15.)

Cantrell was ordered back to his cell. (R. 40, PgID 155.) He was given more than one command to return to his cell. (Defs.' Ex. A at 12:16-12:23.) When Cantrell returned to his cell, instead of entering fully he stood in the doorway to keep the cell door from closing. (R. 40, PgID 155.) Cantrell admits being given multiple commands ("probably three times") to go into his cell and let the door shut. (Defs.' Ex. A at 12:22.)

Shortly thereafter, multiple officers responded to Cantrell's cell to escort him to segregation for his failure to obey multiple direct orders to return to his cell and let the door shut, which he did not due in violation of MDOC policy. (Defs.' Ex. A at 12:11-12:23; R. 40, PgID 155.) Cantrell claims that he continued to ask to speak to a supervisor about his alleged dissatisfaction with the condition of his cell after it was searched. (Ex. A at 11:21.) Sgt. Gary Stump, a supervisor, was present at that time.

4

(Defs.' Ex. B, Stump Dep., p. 11:18-11:21.)  Cantrell did not attempt to discuss the matter with Sgt. Stump.  (Ex. A at 30:24-30:25).

There is video, with audio, of part of the interaction inside Cantrell's cell.  (Defs.' Ex. C, Taser Video.)  At no time on the video does Cantrell mention talking to a supervisor.  (*Id*.)  At no time on the video does Cantrell mention the condition of his cell or attempt to direct any attention to the alleged condition of his cell.  (*Id*.)  Cantrell does, however, take the time to address the taser operator, saying "ain't no one scared of that taser bro, all that shit that you're doin, ain't no one scared of that" with an accompanying wink of his right eye before he is led out of his cell and unit because of his failure to obey prior direct orders.  (*Id*.)

Heilig denies leaving the cell in the condition Cantrell claims.  (Defs.' Ex. D, Heilig Dep., p. 13:7-13:12, 13:23-13:24.)  The taser video further shows the condition of Cantrell's cell following the search, with nothing visibly on the floor or in the toilet and multiple photos still attached to the wall in Cantrell's lower bunk.  (Defs.' Ex. C, E-N Still Photographs captured from Exhibit C.)

Cantrell, handcuffed, was escorted down the housing unit hallway toward the stairs with Heilig (left) and Arp (right) at each arm.  (Defs.' Ex. A at 15:16-15:18; R. 40, PgID 156.)  Cantrell claims that Heilig then said: "[g]et ready, I have something special for your bitch ass" and, as the trio reached the stairs, Heilig repeatedly shouted "stop resisting" approximately six times.  (Defs.' Ex. A at 15:16-16:19.; R. 40, PgID 156.) None of the statements attributed to Heilig are supported by audio on the video evidence.  (Defs.' Ex. C.)

According to Cantrell, as they reached the bottom of the stairs and began walking onto the base of the unit, Arp stuck his foot out in front of Cantrell to take him to the ground.  (R. 40, PgID 156.)  At that point, Cantrell claims that Heilig and several other officers got on top of him, and that Heilig struck him on the left side.  (*Id.*)

According to Heilig, while escorting Cantrell down the stairs, Cantrell attempted to push his bodyweight into Heilig to push Heilig into the stairway rail.  (Defs.' Ex. D at 21:16-22:14.)  This caused Heilig to lose his balance on the stairs.  (*Id.*)  Cantrell then resisted Heilig's efforts to get him into a better position for escort.  (*Id.* at 22:9-23:16).  Cantrell continued to resist by tensing up his body and pinning his arms to his ribs.  (*Id.* at 23:13-23:16)

A thorough investigation was conducted regarding Cantrell's allegations of excessive force. (Defs.' Ex. O, Gilbert Dep., p. 8:2-8:6; Defs.' Ex. P, AIM #22038 Memorandum).  The Investigator ultimately determined that there was insufficient evidence relating to inappropriate use of force, unbecoming conduct, and inhumane treatment of individuals by Heilig and Arp.  (Defs.' Ex. P.)  He concluded that the actions of Heilig and Arp were objectively reasonable.  (*Id.*)

Heilig issued Cantrell a misconduct ticket for disobeying a direct order as a result of ignoring multiple commands to return to his cell and let the door shut.  (Defs.' Ex. Q.)  Heilig also issued Cantrell a misconduct for assault and battery for resisting on the stairs.  (Defs.' Ex. R.)  Cantrell was found not guilty of the assault but guilty of disobeying a direct order.  (*Id.*; Defs.' Ex. Q.)

Heilig and Arp deny using excessive force in taking Cantrell to the ground. (Defs.' Ex. D at 23:7-23:16; Defs.' Ex. S, Arp Dep., at 14:7-14:19.)  Cantrell was taken to the ground so that Heilig and Arp could regain control over him and escort him to segregation.  (*Id*.)  Likewise, both Heilig and Arp deny hitting Cantrell when he was on the ground.  (Defs.' Ex. S at 16:15-16:17; Defs.' Ex. D at 24:7-24:10.)  No punches or strikes appear on facility surveillance video. (Defs.' Ex. T, Institutional Video).

Cantrell claims he sustained two fractured ribs and pain in his pelvis, femur, hip, neck and feet as a result of the incident.  (R. 40, PgID 156.)  The injuries to feet, hip, femur and pelvis were pre-existing.  (Defs.' Ex. U, Excerpts of Plaintiff's Medical Records, p. 001.)  Cantrell had kited medical complaining of serious pain in those areas as recently as three days *before* the August 19, 2017 incident.  (*Id*.)  Following the August 19, 2017 incident, Cantrell did not complain of any injury to his ribs until August 31, 2017.  (*Id* at p. 006.)

According to Cantrell, his retaliation claim against Heilig is based on Heilig not allowing him to talk to a supervisor about the condition of his cell.  (Defs.' Ex. A at 29:4-29:12.)  Cantrell claims that Heilig retaliated against him for asking to speak to a supervisor by tackling him and assaulting him while being moved to segregation.  (*Id*.) He further claims that Heilig issued the assault and battery misconduct ticket in retaliation.  (R. 40, PgID 158.)

Cantrell believes that Arp retaliated by assisting Heilig in preventing him from speaking to shift command about the condition of his cell and then assisting Heilig in taking him to the ground and assaulting him during the movement of Cantrell to

segregation.  (*Id.* at 27:21-27:25.)  Cantrell does not remember ever having a conversation with Arp that led him to believe Arp knew he wanted to speak to a supervisor.  (*Id.* at 28:15-28:18.)

Cantrell is seeking compensatory damages, punitive damages, and attorney fees arising from his First and Eighth Amendment claims.

## STANDARD OF REVIEW

Fed. R. Civ. P. 56(a) of the Federal Rules of Civil Procedure provides that summary judgment shall be granted if the pleadings and evidence show that there is no genuine issue of material fact.  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  This standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact.  *Anderson v. Liberty Lobby Co., Inc.*, 477 U.S. 242 (1986).

"[T]he burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case.*" Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the evidence provided in response by the nonmoving party is merely colorable or is not significantly probative, summary judgment may be granted.  *Action Auto Stores, Inc v. United Capitol Ins. Co.*, 845 F. Supp. 417, 419-20 (W.D. Mich. 1993).  The non-moving party "cannot rely on the hope that the trier of fact will disbelieve the

movant's denial of a disputed fact but must present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Barnhart v. Pickrel, Schaeffer, & Ebeling Co.*, 12 F.3d 1382, 1389 (6th Cir. 1993).

## ARGUMENT

**I.   Cantrell has failed to establish a First Amendment retaliation claim, as he cannot show that he was engaged in protected conduct and, even if he could, he cannot show that any "adverse action" was motivated by his allegedly protected conduct.**

Cantrell claims that Heilig and Arp retaliated against him for requesting to speak to a supervisor about a cell search conducted by Heilig.  (R. 40, PgID 158.) Cantrell claims that, because he requested to speak to a supervisor, Heilig and Arp utilized excessive force in removing Cantrell from his cell, throwing him to the ground, and beating him.  (*Id.*)  He also claims that he was issued an assault misconduct ticket in retaliation for asking to speak to a supervisor.[1]  (*Id.*)

In order to set forth a First Amendment retaliation claim, a plaintiff must establish three elements:  (1) the plaintiff engaged in protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and two.  *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999).

Plaintiff has the burden of proving all three elements of his retaliation claim.  It is not enough for Cantrell to show that a defendant acted with a retaliatory motive and that he was injured—the motive must cause the injury. *Nieves v. Bartlett*, 139 S. Ct.

---

[1] Cantrell does not claim that the original search of his cell was retaliatory.

1715, 1722 (2019).  "Specifically, [the retaliatory motive] must be a "but-for" cause, meaning that the adverse action against the plaintiff would not have been taken absent the retaliatory motive." *Id.*

> The Sixth Circuit has employed a burden-shifting approach:
>
> Once the plaintiff has met his burden of establishing that his protected conduct was a motivating factor behind any harm, the burden of production shifts to the defendant.  If the defendant can show that he would have taken the same action in the absence of the protected activity, he is entitled to prevail on summary judgment.

*Thaddeus-X,* 175 F.3d at 399.  Cantrell cannot succeed on his First Amendment retaliation claim because he cannot show that he was engaged in protected conduct. Further, even if Cantrell was engaged in protected conduct, he cannot show that the complained-of actions were motivated by his allegedly protected conduct.

### A. Heilig and Arp are entitled to summary judgment on Cantrell's retaliation claim because Cantrell has failed to establish that he was engaged in protected conduct.

Cantrell claims that he was retaliated against for asking to speak to a supervisor regarding the search of his cell.  (R. 40, PgID 158.)  This claim fails for several reasons. First, there is nothing to corroborate Plaintiff's self-serving claim that he asked to speak to a supervisor.  Second, a supervisor was present during the brief period relevant to Cantrell's claims, but Cantrell made no attempt to actually speak with a supervisor.  Third, video evidence shows that Cantrell's cell was not left in the condition he claims and, therefore, any grievance about the condition of his cell would have been frivolous and therefore not protected conduct.  Lastly, even if Cantrell was

initially engaged in protected activity, once he became disruptive, he violated a legitimate prison regulation and was no longer protected.

### 1.  Cantrell never asked to speak with a supervisor.

Cantrell claims that he repeatedly asked to speak to a supervisor regarding the condition of his cell after it was searched by Heilig.  In fact, Cantrell claims that he was so adamant about wanting to speak to a supervisor that he improperly exited his cell during his cellmate's medication line (an admission to being out of place) so that he could summon a supervisor.  (Defs.' Ex. A at 9:19-10:15, 12:16-12:23.)  However, Cantrell's claims that he asked to speak to a supervisor are self-serving and without corroboration.

According to Cantrell, he made repeated efforts to get officer attention so that he could request a supervisor.  He ultimately got attention, and that attention is on video.  (Defs.' Ex. C.)  However, when nearly all the housing unit's attention is finally on him, he says nothing about needing a supervisor and says nothing about the alleged unacceptable condition of his cell.  Nowhere on the video of Cantrell being handcuffed and led from his cell to segregation does he request a supervisor or mention anything about his cell at all.  That is despite the fact he was physically standing inside his cell while part of this was being recorded.  Cantrell does, however, take the time to address the taser operator, saying "ain't no one scared of that taser bro, all that shit that you're doin, ain't no one scared of that." (*Id*.)  He also took the opportunity wink at the taser operator just before he is led away.  (*Id*.)

Heilig does not recall Cantrell being upset about the cell search or asking for a supervisor following the cell search.  (Defs.' Ex. D at 17:6-17:9.)  Cantrell testified that he does not remember speaking to Arp about it at all.  (Defs.' Ex. A at 19:7.)  As seen on video, Cantrell makes no supervisor request, and says nothing about his cell, when multiple officers are right there at his cell.  If there was ever a time to request a supervisor, it was before he was led to segregation for, he claims, repeatedly insisting on speaking to a supervisor.  Instead, there is nothing to corroborate Cantrell's self-serving claim that he ever asked to speak to a supervisor about the condition of his cell.

## 2. A supervisor was present, and Cantrell was aware he was present, but Cantrell did not attempt to speak with him.

Even if Cantrell did want to speak to a supervisor, which is denied, he made no attempt to speak to a supervisor when one was present.  Sgt. Gary Stump was the sergeant of Housing Unit 2, Cantrell's unit, on August 19, 2017.  (Defs.' Ex. B at p. 7:13-7:16.)  He was the *only* supervisor of the unit at that time. (*Id.*)  Stump responded to Cantrell's cell during the incident created by Cantrell's non-compliance.  (*Id.* at 10:10.)  Stump recalls that Cantrell was upset and "kind of reeked of alcohol." (*Id* at 11:11-11:13.)  Stump was there at the door when Cantrell was handcuffed. (*Id.* at 11:18-11:21.)

Cantrell remembers Stump being there.  (Defs.' Ex. A at 30:9-30:22.)  However, Cantrell did not attempt to discuss the matter with Stump at that time and has never spoken with Stump about the cell search.  (*Id.* at 30:24-30:25)

Cantrell claims that he repeatedly requested a supervisor.  In fact, he claims that he repeatedly insisted on a supervisor to the point where multiple officers, a

supervisor included, responded to his cell because of the disruption.  (Defs.' Ex. A at 9:19-10:15, 12:16-12:23, 30:9-30:18.)  At that time, however, instead of addressing the only supervisor in the unit, Cantrell chose only to defiantly tell the taser operator that "ain't no one scared of that taser bro…".  (Defs.' Ex. C.)  Thus, Cantrell either gave up at the first opportunity to speak to a supervisor or, more likely, never actually wanted to speak to a supervisor because nothing was wrong with his cell.

### 3. There was nothing out of place in Cantrell's cell after it was searched by Heilig and any grievance or complaint about the condition of his cell would be frivolous.

Both Cantrell's Amended Complaint and his deposition testimony make clear that the foundation of his retaliation claim is his steadfast assertion that he asked to speak to a supervisor.  (R. 40, PgID 158.)  The *only* thing he wanted to speak to a supervisor about was the condition of his cell after it was searched by Heilig.  (*Id*.)  Speaking to a supervisor about the condition of his cell is the "protected conduct" for his retaliation claim.  (*Id*.)  Likewise, both in his Amended Complaint and his deposition, Cantrell goes into great detail about the alleged condition of his cell.  (*Id*. at PgID 155; Defs.' Ex. A, p. 9:4-9:10, 34:15.)  Video evidence shows that the condition, as alleged by Cantrell, simply did not exist.  (Defs.' Ex. C)

According to Cantrell, when he returned to the cell after it was searched by Heilig, he found that Heilig had "destroyed photographs of the Plaintiff's family members by ripping them up and scattering them across the cell floor" and "removed all of the Plaintiff's clothing from his wall locker and left them strewn across the cell floor as well as in the cell toilet."  (R. 40, PgID 155.)  At deposition, Cantrell elaborated

that, in addition to family pictures and clothing being thrown in the toilet and scattered on the floor, everything was pulled out his locker and placed on the floor, his bed and mattress was on the floor and his sheets were off the bed.  (Defs.' Ex. A, p. 9:4-9:10.)  According to Cantrell, these items were scattered across his "*entire* cell floor." (*Id.* at 34:15.)

According to Cantrell, it is that condition, clothes and photos in the toilet, items scattered across the entire floor, that led him to keep insisting to speak to a supervisor. (Defs.' Ex. A at 12:16-12:23.)  It is that condition that led him to leave his cell during his cellmate's medication line when he was not supposed to.  (Defs.' Ex. A at 9:19-10:15, 12:16-12:23.)  It was that condition that caused him to refuse multiple orders to lock down once he returned to the cell.  (*Id.*)

Heilig denies leaving the cell in the condition Cantrell claims.  (Defs.' Ex. D, p. 13:6-13:23.)  Video further shows the condition of Cantrell's cell, with nothing visibly on the floor or in the toilet and what appears to be multiple photos still attached to the wall in Cantrell's lower bunk.  (Defs.' Ex. C; Defs.' Ex. E-N.)

Thus, there is not only no record evidence corroborating Cantrell's claim that his cell was left in a completely wrecked condition, there is video evidence that it was *not* left that way.  (*Id.*)  The video of Cantrell being removed from his cell tells the whole story and is the best evidence of the condition of the cell after it was searched by Heilig. (Defs.' Ex. C.)  In fact, under questioning from his own counsel, Cantrell acknowledged that it would not have made sense for him to clean his cell up before calling a supervisor.  (Defs.' Ex. A at 44:5-45:2.)  If he had cleaned his cell up, it would have done

him no good to call a supervisor because the supervisor could not have seen how the cell was messed up.  (*Id*.)  Cantrell acknowledged that, basically, he needed the mess as proof.  There is no mess, and there is no proof.

"Although an inmate has an undisputed *First Amendment* right to file grievances against prison officials…[t]his right is protected …only if the grievances are not frivolous.  In other words, an inmate's pursuit of grievances against prison officials can constitute protected conduct for purposes of a retaliation claim, but only to the extent that the underlying claims have merit."  *Clark v. Johnston,* 413 F. App'x 804, 812 (6th Cir. 2011); *See also Lewis v Casey*, 518 U.S. 343, 353 (1996) ("Depriving someone of a frivolous claim ... deprives him of nothing at all…")

Cantrell's retaliation claim is grounded in his contention that he wanted to speak with a supervisor about the condition of his cell.  That is the *only* protected conduct he claims. However, none of what Cantrell describes about the condition of his cell is visible on clear video taken at the time he allegedly wanted to complain.   (Defs.' Ex. C.)  The condition Cantrell claims he demanded to complain about simply did not exist.  There was nothing on the floor, let alone all across the entire floor, as Cantrell claims.  There was nothing in the toilet.  Photos are hanging in his bunk.  Therefore, in the unlikely event Cantrell truly wanted to grieve the condition of his cell, that grievance or a verbal complaint to a supervisor would be frivolous at best and not protected conduct.

> **4.  Even if Cantrell was initially engaged in protected activity, once he became disruptive, he was no longer engaged in protected activity.**

Even if Cantrell was initially engaged in protected conduct, asking to speak to a supervisor about the condition of his cell, there can come a point where conduct was no longer protected.  Such is the case here, as Cantrell's behavior ultimately violated legitimate prison regulations.  The Sixth Circuit has held that "if a prisoner violates a legitimate prison regulation, he is not engaged in 'protected conduct,' and cannot proceed beyond step one." *Thaddeus–X*, 175 F.3d at 395.

Cantrell's behavior before being led to segregation can be established by his own words.  Cantrell exited his cell when the door opened for his cellmate.  (R. 40, PgID 155.)  Cantrell acknowledges that he was not supposed to be coming out for medication. (Ex. A. at 9:19-10:15.)  As a result, he was ordered back to his cell.  (R. 40, PgID 155.) He admits being given more than one command to return to his cell.  (Defs.' Ex. A at 12:11, 12:22.)  When Cantrell returned to his cell, instead of entering he stood in the doorway to keep the cell door from closing.  (R. 40, PgID 155.)  He again admits being given multiple commands ("probably three times") to go into his cell and let the door shut.  (Defs.' Ex. A at 12:22.)

Cantrell was then escorted to segregation for disobeying a direct order.  He was issued a misconduct violation for disobeying a direct order.[2]  He was found guilty of disobeying a direct order and was sanctioned to 5 days "Toplock" and 30 days Loss of Privileges.  (Defs.' Ex. Q, 8/19/2017 Disobeying Direct Order Misconduct; Defs.' Ex. A at

---

[2] Plaintiff does not mention this misconduct in his Amended Complaint and does not anywhere allege that it was retaliatory.

37:1-37:9.)  Cantrell acknowledges being given multiple direct orders, which he
disobeyed.  (Defs.' Ex. A at 12:16-12:23.)

While a prisoner may have a right to grieve prison officials, they cannot exercise
that right in a manner that violates legitimate prison regulations or penological
objectives. *Smith v. Campbell*, 250 F.3d 1032, 1037 (6th Cir. 2001) (footnote omitted)
*citing Ward v. Dyke,* 58 F.3d 271, 274 (6th Cir. 1995) ("The ability to transfer a prisoner
who is interfering with prison administration and staff morale goes to the essence of
prison management.").

As a result, though Cantrell may have had the right to speak to a supervisor, he
demanded to do so in a manner that violates legitimate prison regulations and
objectives.  He exited his cell when he was not supposed to.  He ignored multiple direct
orders to return to his cell and let the door shut.  He acknowledges that is what
occurred.  He was found guilty of a misconduct because of it.  For the same reason, he
was not engaged in protected conduct.

**B. Heilig and Arp are entitled to summary judgment on Cantrell's
retaliation claim because Cantrell has failed to establish a causal
connection between any claimed protected activity and the adverse
actions stated in his Amended Complaint.**

Cantrell's Amended Complaint alleges two separate "adverse actions," both of
which, he claims, were in retaliation for asking to speak to a supervisor about the
condition of his cell following the search by Heilig.  First, he claims that Heilig and Arp
improperly used excessive force while escorting Cantrell to segregation.  (R. 40 PgID
158 at 31.)  Second, he claims that Heilig wrote Cantrell a retaliatory misconduct ticket
for assault.  (*Id*. at 32.)  Cantrell does not claim that the original search of his cell was

in any way retaliatory, nor does he appear to claim that Arp had any involvement with the allegedly retaliatory misconduct ticket.

Should this Court find Cantrell has met his burden with respect to the first two elements of his retaliation claim,[3] he nonetheless fails to demonstrate there is a causal connection between elements one and two; that is, that adverse action was motivated by Cantrell's protected conduct.

**1.  As to both Heilig and Arp.**

Should this Court find Cantrell has met his burden with respect to the first two elements of his retaliation claim, Cantrell fails to demonstrate there is a causal connection between elements one and two; that is, the adverse action was motivated by Cantrell's protected conduct.

With respect to the misconduct ticket Cantrell complains of, as well as the alleged excessive force, other than Cantrell's own self-serving allegations, there is no record evidence to suggest Heilig issued a misconduct ticket or that Heilig and Arp "assaulted" Cantrell because he wanted to speak to a supervisor about the cell search. In fact, based on Cantrell's own claims, he *repeatedly* insisted on speaking to a supervisor without anything more happening to him than simply being ignored and/or cursed at by Heilig.  (Defs.' Ex. A at 10:7-10:15, 12:16-12:23.)  According to Cantrell, he was simply told by Heilig to "lock your punk ass down."  (R. 40, PgID. 155.)  The fact is

---

[3] While Defendants acknowledge that subjecting an inmate to the use of excessive force would satisfy "adverse action," Heilig and Arp deny that excessive force was used; as will be further explored in this section and Section II of this brief.

that nothing further happened until Cantrell refused to lock down.  Again, such behavior is not protected conduct.

Cantrell was not removed from his cell until he, by his own admission, disobeyed multiple direct orders from Heilig.  He refused to lock down, as he acknowledges being told to do.  (Defs.' Ex. A at 12:16-12:23.)  As a result, it logically follows that the motivating factor (if any) for the claimed adverse actions was Cantrell disobeying Heilig's orders, not his request to speak to a supervisor.  Cantrell's multiple requests to speak to a supervisor were simply ignored.  Disobeying repeated orders got Cantrell removed from his cell.  As stated above, disobeying direct orders is not protected conduct.

## 2.  As to Arp Only.

Even if this Court finds Cantrell has met the burden as to all the elements of his First Amendment retaliation claim as to Heilig, adverse action and causal connection included, Arp is still entitled to summary judgment.

To begin, Cantrell does not appear to be claiming that Arp had any involvement with the allegedly retaliatory misconduct ticket.  That allegation is directed to Heilig alone.  (R. 40 PgID 158 at 32.)  Even if Cantrell was alleging retaliation on the part of Arp for the misconduct ticket, he can present no evidence that Arp had anything to do with it.  The misconduct ticket was written and signed by Heilig.  (Defs.' Ex. R.)  Cantrell cannot show that Arp was personally involved in issuing the misconduct ticket.  Personal involvement in the alleged adverse action, the misconduct, is required

if liability for retaliation is to attach to Arp.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009).

As to Cantrell's retaliation claims generally, any claim against Arp should be dismissed because Cantrell cannot show that Arp had any knowledge that he wanted to speak to a supervisor about Heilig's cell search.  The complained-of cell search was conducted by Heilig.  (R. 40, PgID 154.)  Arp was not present for the search, and Cantrell does not remember ever speaking to Arp about the search.  (Defs.' Ex. A at 19:7, 28:18.)  Though Cantrell testified that he "believes" that Arp was assisting Heilig to "keep (Cantrell) from speaking to a sergeant or shift command…" Cantrell never spoke to Arp and articulated no basis in fact for his belief.  (*Id*. at 27:21-28:5.)

A Plaintiff cannot establish the causal connection element in a First Amendment retaliation claim when the defendant is unaware that Plaintiff engaged in any protected conduct.  This is because "[t]he defendant must have known about the protected activity in order for it to have motivated the adverse action."  *Hamilton v. Starcom Mediavest, Inc.,* 522 F.3d 623, 628 (6th Cir. 2008) (quoting *Thaddeus-X v. Blatter*, 175 F.3d 378, 387 n.3 (6th Cir. 1999).  Because Arp did not have knowledge of Cantrell's claimed protected conduct, Cantrell cannot establish the third element of his retaliation claim and Arp is entitled to summary judgment for that additional reason.

C.  **Even if Cantrell has satisfied his burden, there is a nonretaliatory basis for the actions of Heilig and Arp.**

Even if Cantrell has met his burden with respect to all three elements of his First Amendment claim, Heilig and Arp had a nonretaliatory basis for their actions. Cantrell was taken to the ground and restrained because he resisted Heilig and Arp

while they were escorting him to segregation. Cantrell was issued a misconduct ticket by Heilig based on the same actions.

A defendant is entitled to summary judgment if he demonstrates that he "would have taken the same action even without the protected activity." *Thomas v. Eby,* 481 F.3d 434, 441-42 (6th Cir. 2007). "[B]are allegations of malice" are insufficient to establish a constitutional claim. *Thaddeus-X,* 175 F.3d at 399. "If the defendant can show that he would have taken the same action in the absence of the protected activity, he is entitled to prevail on summary judgment." *Id.*

The alleged excessive force occurred while Cantrell was being escorted to segregation for disobeying a direct order. Cantrell was mad and has anger issues. (Defs.' Ex. P; Defs.' Ex. B at 11:11-11:13.) While being escorted in restraints by corrections officers, Cantrell, during movement down the stairs, attempted to push his bodyweight into Heilig to push Heilig into the rail. (Defs.' Ex. D at 21:16-21:21.) Cantrell then further resisted Heilig's efforts to get Cantrell into a better position for escort. (*Id.* at 22:9-23:16.) Cantrell continued to resist by tensing up his body and pinning his arms to his ribs, which further inhibited the officers' ability to continue forward movement of Cantrell. (*Id.*) An internal investigation also confirmed this sequence of events and that Cantrell was resisting the movement of him by the corrections officers. (Defs.' Ex. O at 7:8-7:18; Defs.' Ex. P.) Cantrell was being disruptive and resistant. (*Id.* at 26:13-26:14.) He was taken to the ground to get control of him. (Defs.' Ex. D at 23:9-23:11.) Once Cantrell was returned to his feet and under control, the escort to segregation was completed.

21

Cantrell was issued a misconduct ticket for Disobeying a Direct Order for his earlier actions at his cell that resulted in his escort to segregation.  (Defs.' Ex. Q.) Heilig wrote that misconduct.  (*Id*.)  For his actions during the escort to segregation, Heilig issued Cantrell a misconduct for assault and battery.  (Defs.' Ex. R.)  Heilig issued that misconduct because, as stated, at the top of the stairs Cantrell shifted his weight into Heilig and pulled away, which is resisting and what Heilig thought to be intentional contact from Cantrell.  (Defs.' Ex. D at 27:5-28:10, 29:24-30:5.)  That was the charge Heilig believed fit Cantrell's actions during the escort, and it was based on Heilig's perception of the incident.  (*Id*. at 27:5-28:10, 32:4-32:12.)  Thus, the misconduct for assault was not given because of Cantrell's alleged requests to speak to a supervisor but rather based on an officer's perception that Cantrell intentionally forced contact between himself and a corrections officer, which is prohibited by MDOC policy.  (Defs.' Ex. V, MDOC PD Attachment 03/03/105A, "Class I Misconducts" effective date 4-9-2012 at p. 1.)  Cantrell was found not guilty of the assault but guilty of disobeying a direct order.  (Defs.' Ex. Q; Defs.' Ex. R.)

Heilig and Arp submit that Cantrell has not proven the elements of his retaliation claim, and that they have shown adequate alternative reasons as to why Cantrell was issued a misconduct ticket and why he was taken to the ground and restrained during his escort to segregation that was not based on any protected conduct.

## II.   Cantrell cannot establish an Eighth Amendment excessive force claim because Heilig and Arp acted reasonably to restore discipline when Cantrell resisted being escorted to segregation.

Cantrell claims that Heilig and Arp "improperly utilized excessive force in removing him from his cell, throwing him to the ground, and beating him." (R. 40 PgID 158.) This allegedly occurred because Cantrell claims he wanted to speak with a supervisor regarding the condition of his cell after it was searched by Heilig. Heilig and Arp are entitled to summary judgment on Cantrell's excessive force claim because they applied reasonable force in a good-faith effort to restore discipline when Cantrell was resisting escort to segregation.

The Eighth Amendment's proscription against cruel and unusual punishment for excessive force prohibits "the unnecessary and wanton infliction of pain." *Hudson v. McMillan*, 503 U.S. 1, 5 (1992). "Among 'unnecessary and wanton' inflictions of pain are those that are 'totally without penological justification.'" *Whitley v. Albers*, 475 U.S. 312, 319 (1986). But not "every malevolent touch by a prison guard gives rise to a federal cause of action," even if the use of force in question "may later seem unnecessary in the peace of a judge's chambers." *Hudson*, 503 U.S. at 9; *Northington v. Jackson*, 973 F.2d 1518, 1524 (10th Cir. 1992).

When prison officials use force to keep order, the core judicial inquiry is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson*, 503 U.S. at 6-7. Courts must consider the need for the application of force, the relationship between that need and the amount of force used, the threat "reasonably perceived by responsible officials," and any efforts made to temper the severity of the forceful response. *See McHenry v.*

23

*Chadwick*, 896 F.2d 184, 187 (6th Cir. 1990); *Parrish v. Johnson*, 800 F.2d 600 (6th Cir. 1986).

Heilig and Arp used only the force necessary to gain compliance from an angry, resisting prisoner.  (Defs.' Ex. D at 23:7-23:25.)  Cantrell was being escorted to segregation for disobeying a direct order.  (*Id.* at 20:6-20:13.)  The need to move Cantrell to segregation arose from Cantrell's actions when he inappropriately exited his cell when the door opened for his cellmate's medication line.  (Defs.' Ex. A at 9:19-10:4.)  Cantrell was given multiple commands to return to his cell, with which he refused to comply.  (Defs.' Ex. A at 12:16-12:23; Defs.' Ex. D at 20:6-20:13.)  When Cantrell finally returned to his cell, he stood in the doorway to keep the cell door from closing.  (R.40, PgID 155.)  Cantrell admits being given multiple commands to allow the door to shut.  (Defs.' Ex. A. at 12:16-12:23.)  Simply put, Cantrell was being deliberately disruptive, such behavior is violative of MDOC policy and cannot be permitted in a prison setting.

Once the cell door was shut, multiple officers responded to Cantrell's cell to escort him to segregation for Cantrell's violation of prison regulations.  (R. 40, PgID 155; Defs.' Ex. D at 20:8-20:13; Defs.' Ex. Q.)  Cantrell was then escorted down the housing unit hallway toward the stairs with Heilig and Arp at each arm.  (Defs.' Ex. A at 15:18.; R. 40, PgID 156.)  While escorting Cantrell down the stairs, Cantrell attempted to push his bodyweight into Heilig to push Heilig into the rail.  (Defs.' Ex. D at 21:16-21:25.)  This caused Heilig to lose his balance on the stairs.  (*Id.*)  Cantrell then resisted Heilig's efforts to get Cantrell into a better position for escort.  (*Id.* at

22:9-23:16).  Cantrell continued to resist by tensing up his body and pinning his arms to his ribs.  (*Id.* at 23:13)

When Cantrell bumped Heilig, Arp was pushed against the wall and lost control. (Defs.' Ex. S at 13:8-13:14.)  By the time they got to the bottom of the stairs, Cantrell was walking fast.  (*Id.*)  Heilig and Arp tried to control Cantrell, but he "was not having it."  (*Id.*)  At that point, Arp tripped Cantrell to put him on the ground to get control of Cantrell as he had continued to resist against the officers.  (*Id.* at 13:12-13:14, 15:11-15:19.)  Numerous other officers assisted while on the ground.  Both Heilig and Arp deny hitting Cantrell when he was on the ground.  (*Id.* at 16:14-16:20; Defs.' Ex. D at 24:6-24:10.)

Once they had Cantrell under control, Cantrell was then returned to his feet and the escort to segregation was completed.  (Defs.' Ex. D at 23:22-23:25.)  The incident is on video. (Defs.' Ex. T, Institutional Video).  Less than 15 seconds pass between the escort reaching the top of the stairs before Cantrell was restrained on the ground.  (*Id.*) There are numerous bystanders in the area.  (*Id.*)  Several additional officers were needed to gain control of Cantrell and to return him to a position that the escort to segregation can continue.  (*Id.*)  No punches or kicks appear on the video.  (*Id.*)

Cantrell claims he sustained two fractured ribs and pain in his pelvis, femur, hip, neck and feet.  (R. 40, PgID 156.)  The injuries to feet, hip, femur and pelvis were pre-existing.  (Defs.' Ex. U, Excerpts of Plaintiff's Medical Records, p. 001.)  Cantrell had kited medical complaining of serious pain in those areas as recently as three days *before* the August 19, 2017 incident.  (*Id.*)  Following the August 19, 2017 incident,

Cantrell did not complain of any injury to his ribs until August 31, 2017. (*Id*. at pp. 002, 003-006.) While x-rays taken on that day showed rib fractures, he was treated with naproxen and Ace bandages. (*Id*. at pp. 007-008.) He reported playing basketball on September 7, 2017. (*Id*. at p. 009.) He refused x-rays on September 18, 2017 because he was mad. (*Id*. at pp. 010, 011.) When he had follow-up x-rays taken on September 26, 2017, his rib exam was normal. (*Id*. at p. 012.) By the end of September, Cantrell's ribs had healed with no fractures shown. (*Id*. at pp. 013, 014.)

A thorough investigation was conducted into Cantrell's allegations of excessive force. This investigation included Lt. Scott Gilbert reviewing videos, obtaining statements from Heilig and Arp, and interviewing Cantrell, Heilig and Arp. (Defs.' Ex. O at 8:2-8:6; Defs.' Ex. P.) Gilbert ultimately determined that there was insufficient evidence of work rule violations relating to use of force by Heilig and Arp. (*Id*.) Gilbert further concluded, in part:

- Cantrell did not comply with staff direction until an ECD was activated;

- Cantrell became "disruptive, unmanageable and attempt[ed] to hurt the Officers;"

- Cantrell demonstrated active resistance and aggression and admitted to being upset that day and to having anger issues;

- Cantrell would not respond to questions from a registered nurse who attempted to evaluate him after the incident;

- Cantrell said the injuries he mentioned in the grievance – to his pelvis, hip, femur, and feet – were sustained from a motorcycle accident;

- There was "insufficient evidence to support Cantrell's allegations of excessive force;" and that

- Heilig's and Arp's actions in controlling Cantrell were objectively reasonable when using force and within the guidelines.

(Defs.' Ex. P.)

When confronted with allegations of excessive force, a court must pay "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor,* 490 U.S. 386, 396 (1989).

Heilig and Arp did not use unnecessary force when restraining Cantrell. This is an incident of Cantrell's own creation. He was being taken to segregation because he disobeyed multiple direct orders. (Defs.' Ex. A at 12:16-12:23; Defs.' Ex. Q.) Cantrell has anger issues; he was mad. (Defs.' Ex. P.) He resisted escort. As Arp recalls it, "[g]oing down the stairs was a mess. Once he bumped into Heilig we were trying to get control of him and there was no escort at that point." (Defs.' Ex. S at 30:6-30:8.) There were multiple officers as well as bystanders in the area who could have been injured if control over Cantrell was lost. (*Id.* at 15:11-15:19; Defs.' Ex. T.) Heilig and Arp were trying to get control of a mad and unruly inmate they were escorting to segregation for disobeying orders, nothing more.

Where the use of some force is required to restore order, it does not violate the Eighth Amendment unless the force used is "repugnant to the conscience of mankind" or the force is used "maliciously and sadistically for the very purpose of causing harm." *Whitley,* 475 U.S. at 9-10 (citations omitted). Viewing the facts in a light most favorable to Cantrell, at best his claims are sounding in tort. This is because an Eighth

Amendment claim must involve more than a simple assault and battery.  *See e.g. Parrish v. Johnson,* 800 F.2d 600, 604–05 (6th Cir.1986); *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.), *cert. denied, sub nom. Employee–Officer John v. Johnson,* 414 U.S. 1033, 94 S. Ct. 462, 38 L. Ed. 2d 324 (1973);  *See also Neal v. Miller*, 778 F. Supp. 378, 383–85 (W.D. Mich. 1991) ("In drawing the distinction between a common-law battery on the one hand and an Eighth Amendment violation on the other … a single push, shove, punch, or blow by a prison guard simply does not rise to constitutional dimensions.")

Heilig and Arp, as part of their duties, acted reasonably to maintain order.  They are entitled to summary judgment and the excessive force claims should be dismissed.

**III.    Heilig and Arp are entitled to qualified immunity to all personal capacity claims as they did not violate Plaintiff's clearly established constitutional rights.**

The United States Supreme Court has held that governmental officials or employees who are sued in their individual capacities "are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The Sixth Circuit thereafter said that "[t]he failure to so plead, precludes a plaintiff from proceeding further, even from engaging in discovery." *Dominque v. Telb*, 831 F.2d 673, 676 (6th Cir. 1987) (citing *Mitchell v. Forsyth*, 472 U.S. 511 (1985)); *Gomez v. Toledo*, 446 U.S. 635 (1980); *Harlow*, 457 U.S. at 818.

In 1991, the Supreme Court held that prior to determining whether a right is clearly established and prior to entertaining summary judgment where qualified immunity has been asserted, a court must first determine "whether the plaintiff has asserted a violation of a constitutional right at all." *Siegert v. Gilley*, 500 U.S. 226, 231 (1991). A ruling on qualified immunity "should be made early in the proceedings so that the costs and expenses of trial are avoided where the defense is dispositive." *Id*. Qualified immunity is "an entitlement not to stand trial or face the other burdens of litigation" and is "an immunity from suit rather than a mere defense to liability." *Saucier v. Katz*, 533 U.S. 194, 200-201 (2001).

In *Saucier*, the Supreme Court used a two-prong test. A court's first inquiry, taken in the light most favorable to the party claiming the injury, is whether the facts alleged show the officer's conduct violated a constitutional right. *Saucier*, 533 U.S. at 201. If a violation could be made out on a favorable view of the parties' submissions, the next, sequential step "is to ask whether the right was clearly established" and "this inquiry, it is vital to note, must be undertaken in light of the specific context of the case, not as a broad general proposition." *Id*. "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation that he confronted." *Id*.

The Supreme Court later modified *Saucier* in *Pearson v. Callahan,* 555 U.S. 223 (2009). In *Pearson*, the Court held that the two-step *Saucier* analysis is not mandatory. *Pearson*, 555 U.S. at 236. Instead, courts have the discretion to decide

whether, under the facts of the case before them, there is a violation of a

constitutional right or first go to the *Saucier* second prong and decide whether the

defendant's actions violated clearly established law." *Id*.  Lower courts "are in the

best position to determine the order of decision making [that] will best facilitate the

fair and efficient disposition of each case." *Id.*

For the reasons stated above, Heilig and Arp are entitled to qualified

immunity because Cantrell has not demonstrated that they violated any clearly

established constitutional or statutory right.

## CONCLUSION AND RELIEF REQUESTED

Heilig and Arp are entitled to summary judgment as to Cantrell's retaliation

claim because Cantrell was not engaged in protected conduct, cannot show causation,

and Heilig and Arp have demonstrated non-retaliatory reasons for their actions.  The

Defendants are entitled to summary judgment on Cantrell's excessive force claim

because they used reasonable force to restore order when Cantrell resisted during

escort to segregation.  Finally, they are entitled to qualified immunity.

Therefore, Heilig and Arp respectfully request this Court to grant summary

judgment in their favor.

Respectfully submitted,

Dana Nessel
Attorney General

*s/ Josh Marcum*
Josh Marcum (P68244)
Assistant Attorney General
Attorney for MDOC Defendants

MDOC Division
P.O. Box 30217
Lansing, MI  48909
(517) 335-3055
marcumj1@michigan.gov
P68244

Date:  September 28, 2020
Marcum\Cantrell 2018-0238395-B\BIS of MSJ

## CERTIFICATE OF SERVICE

I hereby certify that on **September 28, 2020**, I electronically filed

**MDOC DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, BRIEF IN**

**SUPPORT, INDEX OF EXHIBITS, and EXHIBITS A through V** with the Clerk of

the Court using the ECF system which will send notification of such filing.

*s/ Josh Marcum*
JOSH MARCUM (P68244)
Assistant Attorney General
marcumj1@michigan.gov
P68244

## CERTIFICATE OF COMPLIANCE

Certificate of Compliance with Type-Volume Limit, Typeface Requirements,
and Type Style Requirements

1. This brief complies with the type-volume limitation of Local Civil Procedure Rule 7.2(b)(1), because, excluding the part of the document exempted by Local Civil Procedure Rule 7.2(b)(1), this brief contains no more than 10,800 words. This document contains **7901** words as counted by Microsoft Word Version 2007.

2. This document complies with the typeface requirements of Local Civil Procedure Rules and the type-style requirements of Local Civil Procedure Rules because this document has been prepared in a proportionally spaced typeface generated by Microsoft Word Version 2007 in 12-point Century Schoolbook.

*s/ Josh Marcum*
Josh Marcum (P68244)
Assistant Attorney General
marcumj1@michigan.gov
P68244