UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN

JASON CANTRELL #397429,

    Plaintiff,                                  NO. 1:18-cv-1163

v                                                 HON. GORDON J. QUIST

MICHIGAN DEPARTMENT OF            MAG. PHILLIP J. GREEN
CORRECTIONS, *et al.*,

    Defendants.
_____/

Exhibit B

Gary Stump Deposition Transcript
Taken: March 13, 2020

```
                    UNITED STATES DISTRICT COURT

        IN THE WESTERN DISTRICT OF MICHIGAN, SOUTHERN DIVISION

    JASON CANTRELL,

            Plaintiff,

    v                                         File No. 1:18-cv-1163

                                              HON. GORDON J. QUIST
    ANTHONY HEILIG, SCOTT ARP,
                                              MAG. PHILLIP J. GREEN
            Defendants.
                                        /


                        DEPOSITION OF GARY STUMP

        Taken by the Plaintiff on the 13th day of March, 2020, at

        1727 West Bluewater Highway, Ionia, Michigan, at 2:00 p.m.


    APPEARANCES:

    For the Plaintiff:         MR. DANIEL E. MANVILLE (P39731)
                               Clinical Professor
                               Michigan State University College of Law
                               648 North Shaw Lane, Room 216D
                               East Lansing, Michigan 48824
                               (517) 432-6866

    For the Defendant:         MS. KRISTIE ANN SPARKS (P79177)
                               Assistant Attorney General
                               Department of Attorney General
                               PO Box 30217
                               Lansing, Michigan 48909
                               (517) 335-3055

    Also Present:              Breanne Gilliam, Amanda Keshish


    RECORDED BY:               Marcy A. Klingshirn, CER 6924
                               Certified Electronic Recorder
                               Network Reporting Corporation
                               Firm Registration Number 8151
                               1-800-632-2720



                                  Page 1
```



1                       TABLE OF CONTENTS

2                                                             PAGE

3
        Examination by Mr. Manville and Ms. Keshish. . . . . .    3
4
        Q* = Questions asked by Mr. Manville
5
        Examination by Ms. Sparks. . . . . . . . . . . . . . .   21
6

7

8                         EXHIBIT INDEX
                                                              PAGE
9

10   Deposition Exhibit 1 marked  . . . . . . . . . . . . .     3
        (8/19/17 Critical Incident Report)
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



```
 1                    Ionia, Michigan
 2                    Friday, March 13, 2020 - 1:44 p.m.
 3                    (Deposition Exhibit 1 marked)
 4               REPORTER:  Do you solemnly swear or affirm the
 5       testimony you're about to give will be the whole truth?
 6               MR. STUMP:  Yes, I do.
 7                            GARY STUMP
 8           having been called by the Plaintiff and sworn:
 9                            EXAMINATION
10  BY MR. MANVILLE AND MS. KESHISH:
11  Q    Would you state your full name for the record and spell it,
12       please?
13  A    Gary Alfred Stump, G-a-r-y  A-l-f-r-e-d  S-t-u-m-p.
14  Q    Thank you.  My name is Amanda Keshish and I am a law student
15       representing the Plaintiff, Jason Cantrell, under the
16       supervision of my professor, Dan Manville.
17  A    Okay.
18  Q    Have you ever had a deposition taken before?
19  A    No.
20  Q    Okay.  So before we begin, I would like to share a little
21       bit about how depositions work and then go over a few ground
22       rules in order to keep the record as clean as possible.  So
23       does that sound good?
24  A    Yes.
25  Q    So this deposition is an informal court proceeding.  There
```

Page 3



1         from both prisoners and staff.

2  Q   And were you the sergeant on August 19th, 2017, in housing
3      unit two?

4  A   Yes.

5  Q   And what is your height and weight?

6  A   5'8", about 180 probably.

7  Q   And is that a same or similar weight to that of August 2017?

8  A   Yes.

9  Q   Okay.  So now moving on to the incident that happened --

10 A   Okay.

11 Q   -- on August 19th, 2017.  So as you already stated you were
12     the housing unit two sergeant that night?

13 A   Yes.

14 Q   And who were the other supervisors in the housing unit that
15     night prior to you responding to Cantrell's cell?

16 A   There were no other supervisors.

17 Q   And do you know if an officer is required after a cell
18     shakedown to leave the room in a similar condition as they
19     found it?

20 A   Yes; yes.

21 Q   So is there an MDOC policy that states this?

22 A   Yes.

23 Q   And were you aware that Officer Heilig did not leave
24     Cantrell's cell in the condition as it was before he
25     conducted the search?

Page 7



```
 1  A    No.
 2  Q    Do you agree that this is an -- if the cell was not left in
 3       the same or similar position, would you agree that this
 4       would be in violation of MDOC policy?
 5  A    Yes.
 6  Q    Were you ever informed that the plaintiff wanted to speak to
 7       you after Heilig searched plaintiff's cell?
 8  A    No.
 9  Q    Did you see the plaintiff exit his cell when the doors
10       opened for medication lines later that afternoon/evening?
11  A    I don't recall if I directly observed it.  I don't believe I
12       directly observed him come out, no.
13  Q    And so did you ever get a chance to speak with him prior to
14       the incident?
15  A    I don't -- I don't recall speaking to him prior to the
16       incident, no.
17  Q    Did you ever hear Heilig say to plaintiff, "Keep it up and
18       you're going to get what's coming to you"?
19  A    No.
20  Q    So on August 19th, 2017, did there come a time where you
21       assisted Officer Heilig in housing unit two?
22  A    Yes.
23  Q    How did you become aware that your presence was being
24       requested?
25  A    There was a prisoner on the upper level that -- that refused
```

Page 8



```
 1        to return back to his cell.
 2   Q    So was that over the radio or did you hear it yourself?
 3   A    I don't -- I don't recall exactly how, no.  It may have been
 4        over the radio.
 5   Q    Do you remember if you were in the housing unit when you
 6        received that call?
 7   A    It seemed like I was in the unit on the base area at the
 8        time.
 9   Q    And why did you respond?
10   A    Why did I respond?
11   Q    Yes.
12   A    Generally if there's an incident that involves a prisoner
13        that may be being disruptive, a supervisor should be there.
14        I mean, that -- I don't want to say that that's my personal
15        opinion, but that's -- that's my -- my style of supervision.
16        If the staff -- if the line staff need my help, then I'm
17        there.
18   Q    And did other officers respond to the plaintiff's cell?
19   A    Yes.
20   Q    Who were those officers?
21   A    I do not recall.
22   Q    How many officers were working in the housing unit at the
23        time of the incident?
24   A    The regular staff were there which would have been four, and
25        if I -- if I recall correctly, we had put an additional
```



```
 1       couple of officers, additional staff in there.
 2   Q   And what was your understanding of what was happening up at
 3       the plaintiff's cell prior to your arrival?
 4   A   They were just running med line.
 5   Q   Okay.
 6   A   They were -- yeah, they were releasing prisoners to come out
 7       to get their medication and then to go back to their cells.
 8   Q   So once you received this call and you were on the base
 9       level, what happened next?  What did you do?
10   A   I responded up to the cell.
11   Q   Okay.  And what happened after you arrived at the
12       plaintiff's cell?  What other officers were already there?
13   A   I don't recall.
14   Q   What other officers arrived after you got to the cell?
15   A   I don't recall.
16   Q   Do you remember if the plaintiff's bunkie was inside the
17       cell?
18   A   Yes, he was.
19   Q   Do you remember what Officer Heilig was saying?
20   A   No.
21   Q   Do you remember what Officer Arp was saying?
22   A   No.
23   Q   Do you remember what other officers were saying?
24   A   No.
25   Q   What did you say when you arrived at the cell?
```

Page 10



```
 1   A    I -- I can't quote what I said.  I -- I can't quote.
 2        Generally -- I can't quote what I -- what I said.  Generally
 3        if we have a prisoner -- I -- I -- I can't quote what I
 4        said.  I do not recall.
 5   Q    And do you remember what the plaintiff was saying?
 6   A    No; no.
 7   Q    And did the plaintiff's cell mate say anything?
 8   A    I don't recall.
 9   Q    And what was the plaintiff's behavior when you arrived at
10        the cell?
11   A    He was -- he was upset and I believe there was a strong odor
12        of alcohol coming from him, coming from his breath.  But he
13        was upset and kind of reeked of alcohol.
14   Q    Did you ever see a bag of alcohol in the room or anything?
15   A    I don't recall.
16   Q    Did you aid Officer Heilig in removing plaintiff from his
17        cell?
18   A    I -- I remember being at the door and I remember handcuffs
19        going on the prisoner.  I don't recall who put them on and I
20        don't -- I don't recall if I -- if I had verbally, you know,
21        if I'd given any instructions.
22   Q    That was my next question.  Did you give any verbal commands
23        to the plaintiff?
24   A    I don't recall.  More than likely I did, but I can't say
25        that I did.  Generally I -- I do.  I'm going to try to take
```

Page 11

