UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN

JASON CANTRELL #397429,

      Plaintiff,                      NO. 1:18-cv-1163

v                                  HON. GORDON J. QUIST

MICHIGAN DEPARTMENT OF          MAG. PHILLIP J. GREEN
CORRECTIONS, *et al.*,

      Defendants.

_____/

Exhibit D

Anthony Heilig Deposition Transcript
Taken:  March 13, 2020

UNITED STATES DISTRICT COURT

IN THE WESTERN DISTRICT OF MICHIGAN, SOUTHERN DIVISION

JASON CANTRELL,

        Plaintiff,

v                                          File No. 1:18-cv-1163

                                HON. GORDON J. QUIST

ANTHONY HEILIG, SCOTT ARP,

                                MAG. PHILLIP J. GREEN

        Defendants.

                          /

DEPOSITION OF ANTHONY HEILIG

Taken by the Plaintiff on the 13th day of March, 2020, at

1727 West Bluewater Highway, Ionia, Michigan, at 9:00 a.m.


APPEARANCES:

For the Plaintiff:        MR. DANIEL E. MANVILLE (P39731)
                          Clinical Professor
                          Michigan State University College of Law
                          648 North Shaw Lane, Room 216D
                          East Lansing, Michigan 48824
                          (517) 432-6866

For the Defendant:        MS. KRISTIE ANN SPARKS (P79177)
                          Assistant Attorney General
                          Department of Attorney General
                          PO Box 30217
                          Lansing, Michigan 48909
                          (517) 335-3055

Also Present:             Breanne Gilliam, Amanda Keshish


RECORDED BY:              Marcy A. Klingshirn, CER 6924
                          Certified Electronic Recorder
                          Network Reporting Corporation
                          Firm Registration Number 8151
                          1-800-632-2720


Page 1



1                          TABLE OF CONTENTS

2                                                               PAGE

3
        Examination by Mr. Manville and Ms. Gilliam. . . . .  3, 105
4
        Q* = Questions asked by Mr. Manville
5
        Examination by Ms. Sparks. . . . . . . . . . . . .    99
6

7

8                           EXHIBIT INDEX
                                                              PAGE
9

10      Deposition Exhibit 1 marked  . . . . . . . . . . . .    3
            (Policy Directive 04.04.110)
11      Deposition Exhibit 2 marked  . . . . . . . . . . . .    3
            (8/19/17 Misconduct Report)
12      Deposition Exhibit 3 marked  . . . . . . . . . . . .    3
            (8/19/17 Class I Misconduct Hearing Report)
13

14

15

16

17

18

19

20

21

22

23

24

25



CANTRELL v. HEILIG, ET AL                    DEPOSITION OF ANTHONY HEILIG

```
 1              Ionia, Michigan
 2              Friday, March 13, 2020 - 9:09 a.m.
 3              (Deposition Exhibits 1 through 3 marked)
 4              MR. GILLIAM:  So my name is Breanne Gilliam and
 5         I'm a law student representing the Plaintiff, Jason
 6         Cantrell.  I'm also with and under the supervision of my
 7         Professor Daniel Manville.
 8              REPORTER:  Do you solemnly swear or affirm the
 9         testimony you're about to give will be the whole truth?
10              MR. HEILIG:  Yes.
11                        ANTHONY HEILIG
12           having been called by the Plaintiff and sworn:
13                        EXAMINATION
14    BY MR. MANVILLE AND MS. GILLIAM:
15    Q    Good morning.  Can you please state and spell your full name
16         for the record?
17    A    It's Anthony Heilig, A-n-t-h-o-n-y  H-e-i-l-i-g.
18    Q    Have you ever had your deposition taken before?
19    A    I don't believe so.
20    Q    Okay.  I'd like to tell you a little bit about how
21         depositions work and then go over a few ground rules we like
22         to follow to make sure the transcript is as clean as
23         possible.  So this is an informal court proceeding.  There
24         is no judge, but as you can see we have a court reporter
25         present who is transcribing everything you say, I say, and
```

                        Page 3



NetworkReporting
STATEWIDE COURT REPORTERS
800-632-2720

CANTRELL v. HEILIG, ET AL                    DEPOSITION OF ANTHONY HEILIG

```
1   Q    While performing the shakedown, did Mr. Cantrell have any
2        pictures on his wall?
3   A    I don't recall.
4   Q    Do you remember looking through his pictures or removing
5        them from anywhere?
6   A    I do not.
7   Q    Did you destroy any pictures?
8   A    No.
9   Q    Did you scatter any pictures across the floor?
10  A    No.
11  Q    Did you throw any pictures in the toilet?
12  A    No.
13  Q    Is there any reason why an officer would rip up or destroy a
14       prisoner's pictures when doing a cell shakedown?
15              MS. SPARKS:  I'm just going to object as to
16       speculation, but go ahead and answer.
17  A    Not that I'm aware of.  I would say no.
18  Q    If an officer does destroy pictures, do you know if that
19       would be a violation of any prison policy?
20              MS. SPARKS:  Again, I'll object as to speculation.
21       Go ahead.
22  A    Yeah, we're not -- I'm sure there's a policy.  I don't know
23       what it is.  But we're not -- like I stated earlier, we're
24       not in there to destroy their property.  Now, if something
25       were to happen by mistake, we would -- you know, sometimes
```

Page 13



CANTRELL v. HEILIG, ET AL                    DEPOSITION OF ANTHONY HEILIG

```
 1        to doing my duties in my unit.
 2   Q    And when did you become aware that Mr. Cantrell was upset
 3        with the treatment of his personal belongings?
 4             MS. SPARKS:  Objection as to foundation.  Go ahead
 5        and answer.
 6   A    I don't recall him being upset at the time.
 7   Q    Did Mr. Cantrell ever ask you if he could talk to a
 8        supervisor?
 9   A    Not that I recall.
10   Q    Are prisoners allowed to talk, speak with supervisors?
11   A    Yes.  They can ask for a supervisor.  Sometimes we will ask
12        them if it's something we can handle inside the unit.  We
13        don't always have a supervisor readily available to stop
14        what they're doing and come in and speak to a prisoner at a
15        particular time.  Supervisors make rounds daily in the units
16        on every shift, so they usually try to address the concerns
17        when the supervisors are in the unit.  If it's serious in
18        nature then, yes, we'll call the supervisor in there.  I
19        don't recall him asking to see a supervisor that day.
20   Q    So if an inmate comes up to you and says, "I want to speak
21        to a supervisor," it's in your discretion to decide if it's
22        serious enough?
23             MS. SPARKS:  I'm going to object as to
24        speculation.  Go ahead and answer.
25   A    I would say it's in our discretion to try and solve whatever
```

                              Page 17



CANTRELL v. HEILIG, ET AL                    DEPOSITION OF ANTHONY HEILIG

1       saying, but I repeated myself, "Go lock down.  You don't

2       have med lines," you know, along those lines, and eventually

3       he complied.

4    Q  And then at some point after that did you remove him from

5       his cell?

6    A  His bunkie returned from med line and so his door had to

7       reopen and at that time Prisoner Cantrell stepped into the

8       door, continued cursing, saying stuff.  I told him several

9       more times to, "Step into the cell, let the door close."

10      After the third time or fourth time, I'm not sure how many

11      exactly, but I told him several times, with him not

12      complying, I got on the radio and told the supervisor we had

13      one refusing to lock in.  At that time I approached the door

14      and opened it.  As I was approaching -- let me back up.  As

15      I was approaching the door, he stepped in and allowed the

16      door to close.  I keyed the door open and told him to step

17      out.  He refused.  Sergeant Stump, I believe it was, got up

18      there and told him to come up.  He refused to Sergeant

19      Stump.  At some point Sergeant Stump directed Officer

20      Earegood to turn his ECD on and when he did that, Prisoner

21      Cantrell came to the door, turned around and I placed wrist

22      restraints on him.

23   Q  And his bunkie was in the cell, already back in the cell at

24      this time?

25   A  Yes, I believe.  I think he was sitting on his bunk.

Page 20



CANTRELL v. HEILIG, ET AL                    DEPOSITION OF ANTHONY HEILIG

```
 1   Q    So after you placed the restraints on him, do you recall
 2        which side -- during the escort, which side of him you were
 3        on?
 4   A    I believe his left side.
 5   Q    And who else -- which other officers escorted him?
 6   A    Officer Arp I believe was on his right side, and then
 7        Officer Earegood followed with the ECD on because it has
 8        audio and video recording.
 9   Q    Now escorting him from -- from his cell when you first leave
10        his cell and up to when you get to the stairs --
11   A    Uh-huh (affirmative).
12   Q    -- did he engage in any resistance?
13   A    No.
14   Q    While escorting him down the stairs, did he engage in any
15        resistance?
16   A    He attempted to push his body weight into me at the top of
17        the stairs, which I was on the railing side, so my
18        perception was is he tried to push me into the rail at the
19        top of the stairs, and then we tried to get better control
20        of him by switching our escort technique which he resisted
21        our efforts to do that going down the stairs.  I lost my
22        balance.  I almost fell/tripped going down the stairs.  I
23        believe he was resisting our efforts to, like I said, gain
24        control of us.  I'm not sure -- I was trying to get him in
25        the shoulder lock escort position and he's a large guy and
```

Page 21



CANTRELL v. HEILIG, ET AL                    DEPOSITION OF ANTHONY HEILIG

1   so it was difficult for me to do on one side.  I believe

2   Officer Arp was trying to get into that position and

3   Prisoner Cantrell pinched his arms to his sides, not

4   allowing Officer Arp to get his arm through to get him into

5   the shoulder lock position and we ended up going down to the

6   ground to gain control of him.

7   Q   And I think you said when you were coming down the stairs

8       you tripped or lost your balance?

9   A   Yes.  I was trying to get control of Prisoner Cantrell and

10      while he was resisting as we were going down the stairs, at

11      some point I lost my balance and almost fell, but we -- I

12      didn't and so we continued down the stairs where the

13      struggle to gain control of him continued and eventually we

14      ended up on the ground.

15  Q   When you say the -- can you describe what happened?  Like

16      how you almost fell?  Did you have --

17  Q*  No; on.  Just the incident.

18  A   I don't recall per se.  I think while we were struggling

19      with Prisoner Cantrell I slipped on one of the stairs and I

20      believe I caught myself on the next stair.  I didn't

21      actually go down, but I lost my footing for a second.  And I

22      would have to look at the video again to give you a better

23      description, I guess.  It's been quite awhile.

24  Q   So once you got to the bottom of the stairs, you said you

25      guys took him down.  Why?

Page 22



CANTRELL v. HEILIG, ET AL                    DEPOSITION OF ANTHONY HEILIG

```
 1              MS. SPARKS:  Objection as to the characterization
 2         of the statement -- mischaracterization.  Sorry.  Go ahead
 3         and answer.
 4    A    Could you ask that question again?
 5    Q    Yeah.  Why did you have to take him to the floor at the
 6         bottom of the stairs?
 7    A    Because we could not control him.  He was resisting our
 8         efforts to get him in a more controllable escort position,
 9         and by doing so, he was still able to resist our efforts and
10         so he was taken down to the ground to where we could gain
11         better control of him.
12    Q    How was he resisting?
13    A    He was tensing his body.  He pinned his arms to his ribs so
14         Officer Arp couldn't get his hand through his arm to get a
15         more controlling escort technique and so he was taken to the
16         ground to gain control of him.
17    Q    And once he was on the ground what happened?
18    A    Once he was on the ground, I stayed on his left side.  I got
19         in the correct escort position because I was able to get my
20         arm all the way through and get to the correct position.  I
21         can't speak for anybody else, but we were on the ground.
22         Several officers came in and either took control of his head
23         or his legs or his other arm, and once we had him under
24         control we stood him up and we finished the escort to
25         segregation.
```

Page 23


NetworkReporting
STATEWIDE COURT REPORTERS
800-632-2720

CANTRELL v. HEILIG, ET AL                    DEPOSITION OF ANTHONY HEILIG

1  Q   And when you initially went to the ground, it -- who was the
2      other officer helping you?
3  A   **Officer Arp.**
4  Q   And the rest of the officers didn't come in until after;
5      correct?
6  A   **'Til he was on the ground; correct.**
7  Q   While he was on the ground, did you hit him?
8  A   **NO.**
9  Q   Did you kick him?
10 A   **No.**
11 Q   Did you ever try to trip him?
12 A   **No.**
13 Q   And then once you got him up, you escorted him to
14     segregation; correct?
15 A   **Correct.**
16 Q   And once you got to segregation, where did you -- I think
17     you -- did you place him in a shower?
18 A   **Yes.  To the best of my recollection that is the way we do**
19     **it 90 percent of the time unless somebody's running --**
20     **unless they're running showers, the showers are full.  But,**
21     **yes, once we get to unit eight, the prisoners are patted**
22     **down and they remove their shoes and then we place them in**
23     **the shower where they have their handcuffs removed and they**
24     **are stripped into the unit and then the segregation officers**
25     **will process them into the unit and place them in their**

Page 24



1      cell.

2  Q   And do you recall which shower you would have placed him in?

3  A   I don't.  I don't.

4  Q   Did there come a point in transferring Mr. Cantrell to

5      segregation in which you choked him?

6  A   No.

7  Q   Did there come a time while transferring Mr. Cantrell to

8      segregation in which someone else placed their hands around

9      his neck?

10 A   Not that I recall.

11 Q   And do you know if there was a -- if the video camera was

12     still filming on the escort to segregation?

13 A   I believe it was.  Usually the electronics monitoring

14     officer follows/escorts with the camera unless something

15     else is going on, but --

16 Q   And are you aware that Mr. Cantrell sustained injuries as a

17     result of this incident?

18         MS. SPARKS:  Objection as to foundation.  Go

19     ahead.

20 A   I don't know if he sustained injuries or not.

21 Q   Are you aware that he sustained injuries to his ribs?

22 A   I don't know if he sustained injuries or not.

23 Q   Are you aware that he sustained injuries to his hip?

24 A   I'm not aware of any injuries.

25 Q   Are you aware that he sustained injuries to his foot?

Page 25



1  A   **I'm not aware that he sustained any injuries.**

2  Q   And are you aware that he sustained injuries to his neck?

3  A   **I'm not aware that he sustained any injuries.**

4  Q   Do you recall writing Mr. Cantrell a class I misconduct

5      ticket?

6  A   **Can you be more specific?**

7  Q   On that date in regards to what happened, what we just

8      talked about?

9  A   **Yes, I believe I wrote him a assault ticket.**

10  Q   And can you tell me just in general what a class I

11      misconduct ticket means, what it is?

12  A   **It's the highest ticket we can write which usually the more**

13      **serious charges fall under a class I.  Certain class II**

14      **tickets can be elevated to a class I.  But it's just a class**

15      **of a ticket.  Class III's, officers and PC's can review;**

16      **class II, sergeants have to review and hold court on them,**

17      **lieutenants hold court on them; class I's, I believe an**

18      **outside person reviews them.  I think a lawyer of some kind**

19      **reviews the class I tickets to determine guilt or innocence.**

20      **But depending on the charge, we don't determine the class of**

21      **the ticket.  The charge determines the class of the ticket.**

22      **So if I'm going to write an assault ticket, it's**

23      **automatically a class I.  I don't make the determination on**

24      **what a class is.**

25  Q   And you said the class I is the most severe misconduct

Page 26



1    ticket?

2  A    **Yes.**

3  Q    And do you know what the repercussions are for a prisoner

4       who receives a class I, who is found guilty of a class I?

5  A    **Again, I write the ticket based on the charge I feel fits.**

6       **The class is determined by the charge.  Class I misconducts**

7       **I think might carry more points as far as their security**

8       **level goes, but all of the punitive stuff is handled by the**

9       **person who's holding court, whether they find them guilty or**

10      **not.  So it could be -- it's at their discretion as to what**

11      **to -- what the punishment is going to be if they find him**

12      **guilty.**

13             MS. GILLIAM:  Let the record reflect I'm handing

14      Officer Heilig what has been marked as Exhibit 2.

15 Q    Can you tell me what Exhibit 2 is?

16 A    **Looks like a misconduct.**

17 Q    And is this the misconduct you filled out?

18 A    **Yes.**

19 Q    And can you tell me what the charge is?

20 A    **The charge is assault and battery staff victim.**

21 Q    And why did you charge Mr. Cantrell with assault and

22      battery?

23 A    **Because at the top of the stairs he shifted his weight into**

24      **me and pulled away, which falls in the criteria of assault**

25      **and battery as we're doing our escort, and so that was the**

Page 27



CANTRELL v. HEILIG, ET AL                    DEPOSITION OF ANTHONY HEILIG

```
 1        charge that fit his actions during the escort.
 2   Q    So the assault was -- when you said he pulled away or pushed
 3        into you or both?
 4   A    He did both, both.  Yes.  It started at the top of the
 5        stairs when he shifted his weight into me in what I
 6        perceived as an attempt to get me to either hit the rail or
 7        go over the rail and then he continued to resist by pulling
 8        away and tensing his body while we were going down the
 9        stairs.  And so it was accumulation of all of those actions
10        that is the reason I wrote the misconduct.
11   Q*   Well, if I may?  You said in the ticket, "He pulled away at
12        the top of the stairs causing me to lose my balance"; right?
13        At the end of the first line?
14   A    Yes.
15   Q*   Okay.  And so is that where you're saying he made contact
16        with you?  Because without the contact you don't have an
17        assault; right?
18   A    That's not necessarily true.
19   Q*   There has to be some type of contact.  So I can assault you
20        without contacting you?
21   A    Not like --
22             MS. SPARKS:  Objection as to speculation.  Go
23        ahead and answer.
24   Q    Based upon the misconduct definition, must there be some
25        type of contact?
```

Page 28



1   A    No.

2   Q*   Okay.  So --

3   A    If a prisoner pulls away from me while I'm trying to control

4        him, if I have my hands on him and he pulls away from me --

5   Q*   But that's contact.

6   A    -- that is resisting.  Yes.  I had my hands on him during

7        this entire --

8   Q*   Okay.  But you said that he pulled away, so that was --

9        that's the contact that you're talking about?

10  A    Yes.

11  Q*   Okay.

12  A    I had control -- I had my hand on him.  He was in my

13       control.

14  Q*   Right.

15  A    He pulled away resisting our efforts to gain control of him.

16  Q*   But tensing his body --

17  A    To prevent us from being able to --

18  Q*   Right.  No, I understand, but that's not having contact with

19       you, is it, tensing his body?

20  A    Yes.

21  Q*   Okay.

22  A    Because we have -- we are in contact with him.

23  Q*   Right.

24  A    He's in handcuffs.  There's a two-person escort, two

25       officers have their hands on him.  If we try to go to a more

Page 29



CANTRELL v. HEILIG, ET AL                    DEPOSITION OF ANTHONY HEILIG

1        controlling escort position because he's resisting our

2        efforts, he's being disruptive during the escort and he

3        tenses his body which prevents us from being able to

4        transition into a more controlling position, then, yes, he's

5        resisting our efforts to gain control of him.

6    Q*  And you're aware that the hearing officer found him not

7        guilty?

8    A   Yes.

9    Q*  And the hearing officer had the video; right?

10   A   I'm not sure what the hearing officer had.

11   Q*  When you -- did you -- have you looked at the video prior to

12       today?

13   A   Which video?

14   Q*  The video of the incident.

15   A   There's two videos.

16   Q*  Right.

17   A   Yes.

18   Q*  Have you looked at either one of them?

19   A   Yes; yes, both.

20   Q*  And that's when you met with your counsel; right?

21                MS. SPARKS:  Objection as to privilege.  We're not

22       going to discuss the types of things we did together.  He

23       said he viewed the video, both of them.

24   Q*  Okay.  So was it recently?

25   A   Yes.

Page 30



1  Q*   Have you reviewed it more than once?

2  A    Yes.

3  Q*   Okay.  And so besides with your counsel, when else did you

4       view it?

5  A    I don't recall.

6  Q*   Wasn't it during -- wasn't there -- I forget what they

7       officially call it.  That after the incident there was a

8       meeting of the people involved and it was critiqued?

9            MS. SPARKS:  Objection as to foundation.  Go

10      ahead.  Sorry.  I didn't mean to hit you.

11           THE WITNESS:  No.  You're all right.

12 A    I don't recall if there was one for this incident or not.

13 Q*   Okay.

14 A    And they don't always show videos during those.

15 Q*   So you cannot tell me -- then why -- why besides with your

16      counsel, why else did you view the video if it wasn't part

17      of the critique?

18           MS. SPARKS:  If you know.

19 A    I don't know.

20 Q*   Do you just come in the prison when you're working and go

21      and look at the video because you want to?

22 A    I may have reviewed it to write my ticket.  Sometimes we

23      review it for critical incidents.  That's not a critique,

24      but because this was a critical incident and things happened

25      so fast, we may review the video to recall exactly what

Page 31



CANTRELL v. HEILIG, ET AL                    DEPOSITION OF ANTHONY HEILIG

1        happened, what transpired.

2    Q   But you don't remember whether you did or not?

3    A   **No, I do not remember whether I did or not.**

4    Q*  **Because you don't put anything in here, on the ticket, that**

5        **you reviewed the video in determining what type of**

6        **misconduct you should write, do you?**

7    A   **Right.  It was my perception during the incident.**

8    Q*  **Okay.  So you based upon -- writing this conduct was based**

9        **upon your perception of the incident; right?**

10   A   **Yes.**

11   Q*  **Not on the video?**

12   A   **Correct.**

13            MR. MANVILLE:  Sorry.  Go ahead.

14   Q   And you, I believe you said that you are aware there was a

15       hearing --

16   A   **Yes.**

17   Q   -- for the misconduct?

18   A   **Yup.**

19            MS. GILLIAM:  Let the record reflect I am handing

20       Officer Heilig Exhibit 3.

21   Q   And can you tell me what Exhibit 3 is?

22   A   **It says a "Class I Misconduct Hearing Report."**

23   Q   And in this report the hearing officer wrote that based on

24       viewing the video that one of the officers placed his foot

25       under Mr. Cantrell and tripped him?

                          Page 32



CANTRELL v. HEILIG, ET AL                    DEPOSITION OF ANTHONY HEILIG

1   **A**   **Where do you see that?**

2   Q   If you look in the section, you see where it says

3       "Evidence/Statements in addition" towards the top?

4   **A**   **Yup.**

5   **Q***   **Second line.**

6   Q   It's about the --

7   **A**   **"And -- down the stairs."**

8   Q   -- second or third line.  Did you find it?

9   **A**   **Yup.**

10   Q   Okay.  So were you the one who tripped him?

11   **A**   **No.**

12   Q   Do you know who did?

13   **A**   **I would believe it was Officer Arp who was on the other side**

14       **of his body.**

15   Q   And do you know why he would try to trip him?

16   **A**   **I can't speak to what his thought process was.**

17   Q   And you're aware that the hearing officer found Mr. Cantrell

18       not guilty; correct?

19   **A**   **Correct.**

20   Q   Of assault and battery --

21   **A**   **Correct.**

22   Q   -- correct?  Now I'd like to show you the two videos.

23   **A**   **Okay.**

24             REPORTER:  Are we going to go off the record for

25       this?

Page 33



```
 1              MR. MANVILLE:  No.  We're going to be asking
 2      questions.
 3              REPORTER:  Okay.
 4              MS. SPARKS:  For purposes of the record, are we
 5      going to label it as an exhibit or what are we going to do
 6      with this?
 7              MR. MANVILLE:  Well --
 8              MS. SPARKS:  I know it's a video, but let's make a
 9      statement at least as to where the video -- which video it
10      is as we're viewing it just so it's clear for the record,
11      please.
12              MR. MANVILLE:  Okay.  We will do it once we get it
13      set up and --
14              MS. SPARKS:  Yeah, once it's ready.
15              MR. MANVILLE:  Okay.  For the record, we're going
16      to be showing the two videos that we were provided from
17      Defendants as part of discovery, so we got it from them.
18      Okay.  And if you want to object that we got it from you and
19      it doesn't depict what's going on, feel free to do it.
20              MS. SPARKS:  (Nodding head in affirmative)
21              MR. MANVILLE:  Okay.  Your head is not, you know,
22      okay --
23              MS. SPARKS:  Waiting for you to finish your
24      thought.  I'm sorry.
25              MR. MANVILLE:  Okay.  Prior to it's done.  I --
```

Page 34

