UNITED STATES DISTRICT COURT
IN THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JAMES CANTRELL,

      Plaintiff,

-v-                        Case No. 1:18-cv-1163
                             Hon. Gordon J. Quist
TROY THELAN,  et al.,         Mag. Phillip J. Green

      Defendants,
_____/

## MOTION FOR SUMMARY JUDGMENT
## AND
## BRIEF IN SUPPORT

    Plaintiff is entitled to summary judgment for the reasons stated, *infra*. No genuine issue of material facts exists as to the liability of the Defendants.

### I.      Statement of Facts

    On August 19, 2017, Defendant Heilig (hereafter Heilig) searched Plaintiff Cantrell's cell (hereafter Cantrell) (**Exhibit** 1, Cantrell's Deposition Testimony, at 7.) After searching for approximately ten minutes, Heilig exited the room with a trash bag full of Cantrell's belongings. (*Id.* at 8.) When Cantrell returned to his cell a fan was noticeably missing. (*Id.*) He also noticed that pictures of his family were

in the toilet, some of his personal clothing was in the toilet, and everything from his wall locker was scattered on the floor. (*Id.* at 9.)[1] A review of the video shows the cell floor when Cantrell was backing out of his cell to be cuffed had items scattered on the floor. (see ECF 82-2, Defendants', Taser Video, Time 03-06.)[2] When his door opened so that his roommate could come out for med line, Cantrell exited his cell and attempted to speak with a shift commander about how his belongings were destroyed during the search. (**Exhibit** 1, at 9.) However, Heilig was in the hallway and told Cantrell to go back to his cell. (*Id.* at 10). Cantrell told Heilig that he "need[ed] to speak to a sergeant or shift command." (*Id.*) Heilig responded by saying, "[l]ock your bitch ass down." (*Id.*) Cantrell returned to his cell but stood in the doorway so that the door could not be shut. (*Id.*) Eventually Cantrell went inside of his cell, allowing the door to be closed. (*Id.* at 11.) Heilig considered this refusal to lock up a violation of prison rules, radioed the supervisor, and, with the help of Sergeant Stump and Officer Earegood, who was armed with a taser, "placed wrist restraints on [Cantrell]." (**Exhibit** 4, Heilig's Deposition Testimony, at 20.). Once again Cantrell asked to speak with a sergeant or shift commander. (**Exhibit** 1, at 9.) Another officer came to the cell and pointed a taser at Cantrell. (*Id.*) In his critical incident participant report, Arp wrote that he walked up to Cantrell's cell because

---

[1] His roommate's belongings were not destroyed. (*Id.* at 36. )

[2] In Defendants' Brief in Support, Defendants' counsel does not mention that the video shows items on the floor of the cell as Cantrell is backing out of the cell.

there was no "imminent danger." (**Exhibit** 6, Arp's Critical Incident Participant Report.) When Arp arrived, Cantrell was yelling "I need to talk to a sergeant now;" Arp is not sure if a sergeant was right there when Cantrell said he needed to talk to the sergeant. (**Exhibit** 5, Heilig, at 22.) Cantrell then submitted to the hand restraints. (**Exhibit** 1, at 12.)

Heilig put Cantrell in the hand restraints, and then he and Officer Arp began to escort him down the hallway. (*Id.* at 15; *see* ECF-82-3, Defendants' ECF 82-3, Taser Video.) While walking down the hallway to the stairs, Heilig testified that Cantrell did not engage in any resistance. (**Exhibit** 4, Heilig, at 21) However, for some reason, when the group reached the stairs, Heilig claims "[Cantrell] attempted to push his body weight into [Heilig] at the top of the stairs." (*Id.*, at 21.) While walking down the hallway, Heilig said "bitch ass" to Cantrell and then started staying "stop resisting" when they were at the top of the stairwell. (**Exhibit** 1, at 16.) Cantrell testified that he did not attempt to bump Heilig but was just going with the flow. (*See* ECF-82-4, Defendants Institutional Video, time: 31-37 secs.)

Once they reached the base Arp tripped Cantrell and he was taken to the ground. (*Id.*, Time: 41-1:17 secs.) Several people jumped on top of him causing his face, neck, and feet to be smashed into the ground. (*Id.*) He was hit in his side, neck, back, legs, and arms. (*Id.* at 33.) Heilig kept yelling "stop resisting bitch" while he was hitting Cantrell's left side on the ground. (*Id.* at 34.) Heilig said that because he

believed Cantrell to be resisting, "[Cantrell] was taken to the ground" by Arp after they were on base. (**Exhibit** 4, Heilig, at 23.) But when Officer Arp later asked why this was done, who used his foot to trip Cantrell and take him down, Heilig said "[he] can't speak to what [Arp's] thought process was." (*Id.* at 33.) Arp testified he sought to take Cantrell to the ground because Cantrell was trying to get away from them, he had already "assaulted" a "friend" of Arp's, and he was combative. (**Exhibit** 5, Arp's Deposition Testimony, at 15). While on the ground, Cantrell was not resisting.  (*Id.*) Furthermore, the Hearing Officer's Report dispels any claims that Cantrell "assaulted" either officer, or that Cantrell was trying to get away from them. Once they got him off the ground, Heilig and Arp continued to escort Cantrell to segregation. (**Exhibit** 1, Cantrell, at 31.) [3]

Due to the use of force on him, Cantrell suffered from broken ribs and injury to his pelvis, hip, foot, and neck. Three days prior to this incident, Cantrell sent a Kite complaining about pain in his foot, femur, and pelvis. (*See* **Exhibit** 2, Medical Records at 08/15/2017.) However, this incident aggravated these earlier injuries, so he was subjected to severe pain to the point that he had issue with making transitional movements such as getting up. (**Exhibit** 1 at 22.) When the nurse came to visit

---

[3] At the hearing on Defendants' motion to seal records, Plaintiff agreed that the rest of this video showing the escort to segregation after he was lifted off the floor was not needed as to the claim in this lawsuit. If MDOC wishes to delete from this video 1:17 to Cantrell's placement in segregation, there is no objection by Plaintiff.

Cantrell after the incident, he was unable to speak to her about his injuries because he was out of breath and his throat was sore from being choked a few moments earlier by Heilig. (*Id.* at 24.)

On August 19, 2017, Cantrell submitted a Kite for his injuries. (**Exhibit** 4, Heilig, at 08/19/201.) He complained of being in a lot of pain in his left femur, pelvis, hip, and right foot. (*Id.*) The nurse responded by telling him to purchase pain medicine and that he would schedule him an appointment to be checked. (*Id.*) On August 28, 2017, Cantrell complained again of having neck, head, feet, pelvis, femur, and hip pain. (*Id.* at 08/28/2017.) [ Cantrell was finally examined on August 31, 2017 and the nurse ordered X-ray exams for his ribs, chest and hip. (*Id.* at 08/31/2017.) The X-ray results showed that "the left ribs demonstrate fractures of ribs nine and ten near the rib angles." (*Id.* at 09/06/2017.) On September 5, 2017, Cantrell submitted another kite because he was "coming up the stairs and something popped in [his] hip/pelvis." (*Id.* at 09/05/2017.) When Cantrell was examined again on September 7, 2017, he complained of his ribs hurting when he breathes and that his hip felt like it was coming out followed by numbness. (*Id.* at 09/07/2017.) After his examination on September 7, Cantrell submitted another kite because his left hip gave out again and he was unable to move his left leg. (*Id.* at 09/07/2017.)

On September 7, Cantrell was examined by a nurse for the second time that day, and he complained of being in pain when he breathes. (*Id.* at 09/07/2017.) On

September 8, 2017, Cantrell submitted a kite asking for pain medicine for his fractured ribs. (*Id.* at 09/08/2017.) On September 11, 2017 Cantrell was examined by a nurse again. (*Id.* at 09/11/2017.) At that visit Cantrell complained of being in pain when climbing the stairs and having a hard time taking deep breaths, so the nurse ordered a second X-ray. (*Id.*) On September 13, Cantrell was examined by a nurse again and complained of being in pain "all the time." (*Id.* at 09/13/2017.) When it was time for the second X-ray, Cantrell initially refused because he was mad. (*Id.* at 09/22/2017.) Cantrell received his second X-ray on September 26 and it showed that his fractured ribs were healed. (*Id.* at 09/27/2017.)

After the incident, Heilig charged Cantrell with a Class 1 Misconduct for Assault and Battery on a Staff Victim. (**Exhibit** 3, Misconduct Report and Misconduct Hearing Report.) The misconduct alleged that:

> While escorting Prisoner Cantrell #397428 from 2-246B to Housing Unit 8 He pulled away at the top of the stairs causing me to lose my balance.  Prisoner Cantrell continued to tense his body and resist our efforts to gain control. Prisoner Cantrell was placed on the ground given orders to stop resisting. Prisoner Cantrell continued to resist. We gained control of Prisoner Cantrell and finished the escort to Housing Unit B. ID by state IS & HU count board.

*Id.*, at 1. Heilig testified that he wrote the misconduct on Cantrell "[b]ecause at the top of the stairs [Cantrell] shifted his weight into [Heilig] and pulled away." (**Exhibit** 4, at 27.) However, in the Misconduct Report, Heilig wrote that, "[Cantrell] pulled away at the top of the stairs causing [Heilig] to lose [his] balance" and that "Cantrell

continued to tense his body and resist [their] efforts to gain control." (**Exhibit** 3, at 1.) Additionally, Heilig wrote that, "it was the accumulation of all those actions" that caused him to write the misconduct. (**Exhibit** 4, at 28.)

The Hearing Officer found Cantrell not guilty because "[t]he video shows [Heilig] lose his footing, but it is not clear that [Cantrell] at any time tenses up." (Exhibit 3, at 2.) Furthermore, the Hearing Officer wrote that, "[Cantrell's] explanation of the event, that he was just going with the motion, also is consistent with the video." (*Id.*) The Hearing Officer was "not convinced that [Cantrell] physically resisted or interfered with an employee" and that the video does not indicate that Cantrell's "action was a non-consensual touching of another person done either in anger or with the purpose of abusing or injuring another." (*Id.*)

Heilig's misconduct report was "based upon [his] perception of the incident," rather than based on the video. (**Exhibit** 4, Heilig's Deposition Testimony, at 32.) A review of the wall video against the claim that at 51 seconds into the video "[Cantrell] attempts to shifts his weight into [Heilig];" shows that at 52 seconds, "the side of [Cantrell's] body is straight up and down." (*Id.* at 43-44; *see* also ECF 82-3, Institutional Video.) Even more confusingly, Heilig testifies that going *frame by frame* he can't see where the shift takes place, but that he can "always see it" in the videos. (**Exhibit** 4, at 104 (emphasis added).) Regardless of Heilig's "perception" of what occurred, the Hearing Officer's report, which was based on his review of the

video footage unlike the misconduct report, held that Cantrell was not guilty, that Cantrell's report of what happened was consistent with the video, and that the Hearing Officer was not convinced that Cantrell "physically resisted or interfered with an employee." (**Exhibit** 3, Misconduct Hearing Report, at 2.)

The video also confirmed that one of the officers placed his foot under Cantrell to trip him when on base. (*Id*.; *see* also ECF 82-2 and EF 82-3**,** Videos.) The Hearing Officer found that Cantrell did not physically resist or interfere with an employee. (*Id.*) For those reasons, Cantrell was found not guilty of the assault and battery misconduct. (*Id.*) Heilig's misconduct charge against Cantrell could have resulted in him being placed in a level 5 prison, being placed in segregation long term, and/or being charged criminally for assault on an officer. (**Exhibit** 1 at 39.)

## LEGAL STANDARD FOR SUMMARY JUDGMENT

The moving party has the burden to show that no genuine issue of material fact exists and may meet that burden by "showing-that is, pointing out to the district court-that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986) (internal quotation marks omitted). In reviewing a summary judgment motion, this Court is prohibited from making credibility judgments and weighing of the evidence. Rather, the evidence should be viewed in the light most favorable to the non-moving party. *Anderson v.*

*Liberty Lobby*, Inc., 477 U.S. 242, 255 (1986). Thus, "the facts and any inferences that can be drawn from those facts[] must be viewed in the light most favorable to the nonmoving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Once the moving party has satisfied his burden, "the party opposing the motion then may not 'rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact' but must make an affirmative showing with proper evidence in order to defeat the motion." *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009) (quoting Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479 (6th Cir. 1989)). "The respondent must 'do more than simply show that there is some metaphysical doubt as to the material facts.'" *Street*, 886 F.2d at 1480 (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

## II.   LEGAL ARGUMENTS

### A. Cantrell Is Entitled To Summary Judgment Because He Established That Heilig And Arp Retaliated Against Him For Asking To Speak To A Supervisor And The Hearing Officer's Findings Must Be Given Preclusive Effect.

Heilig and Arp retaliated against Cantrell for requesting to speak with a supervisor about the way Heilig destroyed Cantrell's belongings during a cell search. Heilig and Arp retaliated against Cantrell by using excessive force to assault him

and by issuing him a false assault misconduct ticket. To prove a retaliation claim, the plaintiff must show that (1) the plaintiff engaged in protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; (3) there is a causal connection between elements one and two. *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999). After the plaintiff meets his burden of establishing that the protected conduct was a motivating factor of the adverse action, the burden shifts to the defendant to show that he would have taken the same action in the absence of the protected activity. *Id.* at 399.

   1. **Cantrell was engaged in protected conduct when he asked to speak with a supervisor about his belongings being destroyed by Heilig during a cell search.**

Cantrell engaged in protected conduct when he asked multiple times to speak to a supervisor about Heilig destroying his belongings during a cell search. "An inmate has an undisputed First Amendment right to file grievances against prison officials on his own behalf." *Herron v. Harrison*, 203 F.3d 410, 415 (6th Cir. 2000). This is true even if the grievance is pursued orally, rather than in writing. *Maben v. Thelen*, 887 F.3d 252, 265 (6th Cir. 2018).

The evidence supports Cantrell's claim that he asked to speak to a supervisor. In Heilig's Critical Incident Participant Report, he confirms that he engaged with Cantrell when he exited his cell at med lines by saying that he "gave Cantrell two

direct orders to return to his cell." (**Exhibit** 7, Heilig's Critical Incident Participant Report, at MDOC 004.) Additionally, Arp confirmed in both his Critical Incident Participant Report and his deposition that Cantrell asked to speak with a supervisor. (*See* **Exhibit** 6, at MDOC 008; **Exhibit** 5, at 22.)  Arp said that when he was at Cantrell's cell to escort him to segregation Cantrell was yelling "I need to talk to a sergeant now." (*Id.*)

Cantrell's verbal complaints were enough to constitute protected conduct. In *Maben*, the Court found that the plaintiff engaged in protected conduct when he complained about the inadequacy of his food portion to a line worker, cafeteria worker, and cafeteria supervisor. *Maben*, 887 F.3d at 264. By complaining, the plaintiff was engaging in the process of pursuing a grievance and seeking redress of that grievance. *Id.* This qualified as protected conduct "even though [the plaintiff] pursued his grievance orally, rather than in writing." *Id.* at 265. Similarly, to the plaintiff in *Maben*, Cantrell was pursuing a grievance when he told Heilig that he wanted to speak to a supervisor. During med line, Cantrell exited his cell and attempted to speak with a shift commander about how his belongings were destroyed during the search but Heilig told him to return to his cell. (**Exhibit** 1, at 9-10.) Cantrell told Heilig that he "need[ed] to speak to a sergeant or shift command." (*Id.* at 10.) Heilig responded by saying, "Lock your bitch ass down." (*Id.*) When Heilig

returned to Cantrell's cell to take him to segregation, Cantrell once again asked to speak with a sergeant or shift commander. (*Id.* at 11.) Thus, Cantrell was engaged in protected conduct when he verbally made the request to talk to a supervisor.

> **2. Heilig and Arp took adverse actions against Cantrell when they used excessive force and issued a false misconduct ticket in retaliation of him asking to speak to a supervisor.**

Heilig and Arp took adverse actions against Cantrell by using excessive force and issuing a false misconduct ticket. Two adverse actions took place after Cantrell asked to speak to a supervisor about the way Heilig destroyed his belongings. First, Heilig and Arp used excessive force against Cantrell when they were escorting him to segregation. Second, Heilig wrote a false assault on a staff misconduct ticket and Arp supported the ticket even though he knew Cantrell did not assault anyone.

Subjecting an inmate to the use of excessive force is an adverse action[4]. Issuing a false misconduct ticket against Cantrell is also an adverse action. To decide whether issuing a misconduct ticket rises to the level of an adverse action, the court looks at both the punishment the plaintiff faced and the punishment the plaintiff could have faced. *Maben*, 887 F.3d at 266.  In *Brown v. Crowley*, the plaintiff was already in administrative segregation before the issuance of an alleged retaliatory misconduct ticket. 312 F.3d 782, 789 (6th Cir. 2002). The Court found that it was

---

[4] Heilig and Arp acknowledge that subjecting an inmate to the use of excessive force would be an adverse action. (*See* ECF No. 78, at PageID.392, Footnote 3.)

still an adverse action because "the issuance of the major misconduct charge subjected him to the risk of significant sanctions." *Id.* Thus, even though Cantrell was already placed in segregation for disobeying a direct order, Heilig's fabricated misconduct ticket still amounted to an adverse action. Heilig charged Cantrell with a Class 1 misconduct for assault and battery on a staff victim. (**Exhibit** 3.) Heilig's misconduct charge against Cantrell could have resulted in him being placed in a level 5 prison, being placed in segregation long term, and being charged criminally for assault on an officer. (**Exhibit** 1 at 39.)  Certainly, a jury could find that those consequences are severe enough to deter a person of ordinary firmness from continuing to engage in the protected conduct of pursuing a grievance against an officer. *See Maben*, 887 F.3d at 266-67 (holding that even the filing of a false minor-misconduct charge can be sufficiently adverse to support a retaliation claim) (citing *Hill v. Lapin*, 630 F3d 468, 474 (6th Cir. 2010) (holding that "actions that result in more restrictions and fewer privileges for prisoners are considered adverse")).

### 3.  There is a causal connection between Cantrell's protected conduct and Heilig and Arp's adverse actions that were taken against him.

Cantrell can establish a causal connection between his protected conduct and the adverse actions. To satisfy the causal connection element, the plaintiff has to show that the adverse action was motivated at least in part by his protected conduct. *Thaddeus-X*, 175 F.3d at 394. The question of causation can be satisfied by

circumstantial evidence. *Maben*, 887 F.3d at 267. Temporal proximity between the protected conduct and the retaliatory acts create an inference of retaliatory motive. *Id.* (citing *King v. Zamiara*, 680 F.3d 686, 695-96 (6th Cir. 2012)). Cantrell's protected conduct and the adverse actions were connected as one sequence of events. Cantrell was being escorted to segregation for disobeying a direct order because he exited his cell to initiate his complaint against Heilig. Heilig and Arp used excessive force during that escort by intentionally tripping and jumping on Cantrell. (*See* ECF-82-4, Defendants Institutional Video.) Immediately following the escort, Heilig wrote a misconduct ticket falsely accusing Cantrell of assault. Heilig's claim was easily disputed by the evidence, which is why the hearing officer found Cantrell not guilty. The Hearing Officer determined that one of the officers lost his balance while escorting Cantrell down the stairs and the video confirmed Cantrell's explanation that he was just going with the motion. (**Exhibit** 3 at 2; *see* also ECF 82-2 and EF 82-3, Videos.) The video also confirmed that one of the officers placed his foot under Cantrell to trip him when on base. (*Id.*) The Hearing Officer found that Cantrell did not physically resist or interfere with an employee. (*Id.*) There is no evidence that supports Heilig's claim that Cantrell assaulted him. Since the misconduct was fabricated and it happened during the same sequence of events as the protected conduct, an inference of retaliatory motive is created.

**4. Heilig and Arp cannot show that their adverse actions were justified because the misconduct Hearing Officer's finding of fact that Cantrell did not resist must be given preclusive effect.**

The misconduct Hearing Officer's finding of fact that Cantrell did not resist must be given preclusive effect. The Hearing Officer found Cantrell not guilty because "[t]he video shows [Heilig] lose his footing, but it is not clear that [Cantrell] at any time tenses up." (**Exhibit** 3 at 2.) The Hearing Officer also found that "[Cantrell's] explanation of the event, that he was just going with the motion, also is consistent with the video." (*Id.*) Heilig's fabricated misconduct charge against Cantrell could have resulted in him being placed in a level 5 prison, being placed in segregation long term, and/or being charged criminally for assault on an officer. (**Exhibit** 1 at 39.)

"When a state agency acting in a judicial capacity resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate, federal courts must give the agency's fact finding the same preclusive effect to which it would be entitled in the State's courts." *Peterson v. Johnson*, 714 F.3d 905, 912 (6th Cir. 2013) (citing *Tennessee v. Elliott*, 478 U.S. 788, 799 (1986)). To determine whether preclusive effect must be given to fact finding in major misconduct hearings, four factors must be met: (1) the state agency was acting in a judicial capacity; (2) the hearing officer resolved a disputed issue of fact that was properly before it; (3) the prisoner had an adequate opportunity to litigate the dispute; and (4)

if the first three factors are met, the agency's finding of fact must be given the same preclusive effect it would be given in state courts. *Maben*, 887 F.3d at 259.

Under the first factor, for the agency to be acting in a judicial capacity it must hear evidence, give the parties the opportunity to brief and argue their version of the facts, and give the parties the opportunity to seek judicial review of an adverse finding. *Peterson*, 714 F.3d at 912. Michigan courts have recognized prison hearing officers as acting in a judicial capacity when presiding over a major misconduct hearing because of the judicial-type protections available to Michigan prisoners. *Id.* Some of those protections include the accused prisoner must receive an evidentiary hearing without undue delay, must be given reasonable notice of the hearing, and must have the opportunity to present evidence and arguments on the issues of fact. *Id.* (*see* Mich. Comp. Laws § 791.252.) Additionally, the hearing officer must be an attorney, must be impartial, and must issue a final written decision based on the preponderance of the evidence. *Id.* For those reasons, the Hearing Officer in this matter was acting in a judicial capacity.

Moving to the second factor, Cantrell's Hearing Officer resolved a disputed issue of fact that was properly before him. There was a factual dispute as to whether Cantrell assaulted Heilig while going down the stairs. The Hearing Officer reviewed Heilig's misconduct report, Cantrell's statement about what occurred, and the video footage of the escort to segregation. Based on the evidence, the Hearing Officer

concluded that Cantrell did not assault or physically resist any employee. (**Exhibit 3, at 2.**) The Hearing Officer found that Cantrell's explanation that he was just going with the motion was consistent with what occurred on the video; furthermore, he concluded that the Misconduct Report and the video do not indicate that [Cantrell's] action was a non-consensual touching of another person done in anger or with the purpose of abusing or injuring another. (*Id.*) Cantrell had an adequate opportunity to litigate the factual dispute at the hearing with the opportunity to appeal the decision if he wanted to, which satisfies the third factor. Since the first three factors are satisfied, the agency's finding of fact must be given preclusive effect. The video evidence and the Hearing Officer's findings confirm that Heilig and Arp did not have a non-retaliatory reason for their actions because Cantrell did not resist. Therefore, Cantrell is entitled to summary judgment because he established that Heilig and Arp retaliated against him for asking to speak to a supervisor by using excessive force to assault him and issuing a fraudulent misconduct ticket.

### B. Cantrell Is Entitled To Summary Judgment Because Heilig And Arp Used Excessive Force And The Hearing Officer's Finding that Cantrell Did Not Resist Must Be Given Preclusive Effect.

The Eighth Amendment's proscription against cruel and unusual punishment for excessive force prohibits 'the unnecessary and wanton infliction of pain.'" (*Id.* citing *Hudson v. McMillan*, 503 U.S. 1, 5 (1992)). "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a

prisoner's constitutional rights." *Johnson v. Glick*, 481 F.2d 1028, 1033 (2nd Cir. 1973). However, "[a] violation of the Eighth Amendment nevertheless will occur if the infliction of pain upon a prisoner is both unnecessary and wanton." *Parrish v. Johnson*, 800 F.2d 600, 604 (6th Cir. 1986). "Among the 'unnecessary and wanton' inflictions of pain [constituting cruel and unusual punishment forbidden by the Amendment] are those that are 'totally without penological justification.'" *Hope v. Pelzer*, 536 U.S. 730 (2002) (citing *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981)).

Here, the unnecessary and wanton infliction of pain by Heilig and Arp against Cantrell were utterly without penological justification since Cantrell did not resist or assault either officer. (**Exhibit** 3, Misconduct Report, at 2.) Because Cantrell did not resist while being escorted to segregation, Heilig and Arp did not act reasonably to restore discipline; therefore, Defendants have violated the Eighth Amendment and used excessive force against Cantrell without penological justification.

After the encounter that resulted in Arp and Heilig taking Cantrell to the ground, Heilig charged Cantrell with a Class 1 Misconduct for Assault and Battery on a Staff Victim. The Hearing Officer was "not convinced that [Cantrell] physically resisted or interfered with an employee" and that the video does not indicate that Cantrell's "action was a non-consensual touching of another person done either in anger or with the purpose of abusing or injuring another." (**Exhibit** 3, Misconduct Report, at 2.) The Hearing Officer found Cantrell not guilty because "[t]he video

shows [Heilig] lose his footing, but it is not clear that [Cantrell] at any time tenses up." (*Id.*) Furthermore, the Hearing Officer wrote that, "[Cantrell's] explanation of the event, that he was just going with the motion, also is consistent with the video." (*Id.*) Heilig's misconduct report was "based upon [his] perception of the incident," rather than based on the video. (**Exhibit** 4, Heilig's Deposition Testimony, at 32.) Regardless of Heilig's "perception" of what occurred, the impartial Hearing Officer's report, which was based on his review of the video footage unlike the misconduct report, held that Cantrell was not guilty, that Cantrell's statement of what happened was consistent with the video, and that the Hearing Officer was not convinced that Cantrell "physically resisted or interfered with an employee." (**Exhibit** 3, Misconduct Hearing Report, at 2.) Therefore, Heilig and Arp's actions were done without any penological justification.

All Eighth Amendment claims involve an objective and a subjective component. *Hudson v. McMillian*, 503 U.S. 1, 8-9 (1992). The degree of harm necessary to satisfy the objective component depends on "contemporary standards of decency." *Estelle v. Gamble*, 429 U.S. 97, 103 (1976). When prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated, "[w]hether or not significant injury is evident." *Hudson*, 503 U.S. at 9. Thus, while the extent of an inmate's injury may help determine the amount of force used by the prison or jail official, it is not dispositive

of whether an Eighth Amendment violation based on excessive force has occurred. *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010). Here, the Hearing Officer found that Cantrell did not resist or use force against the Defendants.

Additionally, the eggshell theory that the Sixth Circuit recognized in *Meyers v. Wal-Mart Stores, East, Inc.* applies in the present case. 257 F.3d 625, 632 (6th Cir. 2001). In *Meyers*, the court observed that where the plaintiff suffers from a pre-existing medical condition the case "is essentially a parallel to the classic textbook example of the plaintiff with an eggshell skull, where the tortfeasor must take the injured party as it finds him, and is liable for the full extent of the harm caused by its negligence, even if a more 'normal' plaintiff would not have suffered nearly as much." *Id.* (citing W. Page Keeton et al., Prosser and Keeton on The Law of Torts § 43 at 291-92 (5th ed. 1984)). Cantrell has alleged that he suffered physical injuries that were aggravated by the use of force of the Defendants.

The proper inquiry then for this Court is "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Whitley v. Albers*, 475 U.S. 312, 320-21 (1986). Factors that are typically considered in this determination include: (1) the relationship between the need for force and the amount of force that was used, (2) the extent of any safety threat to staff or inmates, and (3) any efforts made to temper the severity of a forceful response. *Id.* at 321.

Analyzing the facts in the present case to the above factors clearly shows that the force used against Cantrell was objectively unreasonable. For example, looking at the relationship between the need for the use of force and the amount of force used, one can easily arrive at the conclusion that where an impartial Hearing Officer held Cantrell did not engage in any assault or resistance against either officer, that the amount of force used massively outweighs the need for the use of force. (**Exhibit** 3, Misconduct Report, at 2.) Therefore, the force used by Arp and Heilig was both without penological justification and objectively unreasonable.

To reiterate, Cantrell was found not guilty of assault or resisting by an impartial Hearing Officer who wrote that, "[Cantrell's] explanation of the event, that he was just going with the motion, also is consistent with the video." (**Exhibit** 3, Misconduct Report, at 2.) Here, the unnecessary and wanton inflictions of pain by Heilig and Arp against Cantrell were objectively unreasonable and utterly without penological justification since Cantrell did not resist or assault either officer.

Further, the misconduct Hearing Officer's finding of fact that Cantrell did not resist must be given preclusive effect. "When a state agency acting in a judicial capacity resolves disputed issues of fact properly before it which the pirates have had an adequate opportunity to litigate, federal courts must give the agency's fact finding the same preclusive effect to which it would be entitled in the State's courts." *Peterson v. Johnson*, 714 F.3d 905, 912 (6th Cir. 2013) (citing *Tennessee v. Elliott*,

478 U.S. 788, 799 (1986)). To determine whether preclusive effect must be given to fact finding in major misconduct hearings, four factors must be met: (1) the state agency was acting in a judicial capacity; (2) the hearing officer resolved a disputed issue of fact that was properly before it; (3) the prisoner had an adequate opportunity to litigate the dispute; and (4) if the first three factors are met, the agency's finding of fact must be given the same preclusive effect it would be given in state courts. *Maben*, 887 F.3d at 259. It was established above that these elements are met in the present case. Therefore, the Hearing Officer's finding of fact must be given preclusive effect, which confirms that Heilig and Arp were not justified in their use of force because Cantrell did not resist or assault either officer.

WHEREFORE, for the reasons stated above, this Court should grant Plaintiff Cantrell's summary judgment as to liability.

Respectfully submitted,
/s/ Daniel E. Manville
Daniel E. Manville (P39731)
Counsel for the Plaintiff
Director, Civil Rights Clinic
Michigan State University College of Law
PO Box 1570
East Lansing, Michigan 48823
(517) 432-6866
daniel.manville@law.msu.edu

## CERTIFICATE OF COMPLIANCE

Certificate of Compliance with Type-Volume Limit, Typeface Requirements, and Type Style Requirements

1. This brief complies with the type-volume limitation of Local Civil Procedure Rule 7.2(b)(1), because, excluding the part of the document exempted by Local Civil Procedure Rule 7.2(b)(1), this brief contains no more than 10,800 words. This document contains **5580** words as counted by Microsoft Word for MAC Version 16.42.

2. This document complies with the typeface requirements of Local Civil Procedure Rules and the type-style requirements of Local Civil Procedure Rules because this document has been prepared in a proportionally spaced typeface generated by Microsoft Word Version 2007 in 14-point Times New Roman.

s/ Daniel E. Manville