UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN

JASON CANTRELL #397429,

 Plaintiff,         NO. 1:18-cv-1163

v              HON. GORDON J. QUIST

MICHIGAN DEPARTMENT OF   MAG. PHILLIP J. GREEN
CORRECTIONS, ANTHONY HEILIG,
and SCOTT ARP,

 Defendants.

| | |
|---|---|
| Dan Manville (P39731) | Josh Marcum (P68244) |
| Attorney for Plaintiff | Assistant Attorney General |
| Civil Rights Clinic | Attorney for MDOC Defendants |
| MSU College of Law | Michigan Department of Attorney General |
| P.O. Box 1570 | MDOC Division |
| East Lansing, MI 48823 | P.O. Box 30217 |
| (517) 913-9690 | Lansing, MI 48909 |
| daniel.manville@law.msu.edu | (517) 335-3055 |
| | Marcumj1@michigan.gov |

**MDOC DEFENDANTS' REPLY IN SUPPORT OF THEIR
MOTION FOR SUMMARY JUDGMENT**

I. **First Amendment Retaliation**

 A. **Cantrell's retaliation claim fails because he was not engaged in protected conduct.**

  The record is clear that Cantrell is claiming that Heilig and Arp retaliated against him for "requesting to speak with a supervisor about the way Heilig ***destroyed*** Cantrell's belongings during a cell search." (R. 86, Pl.'s Br., PgID 592 (emphasis added)). Speaking with a supervisor is the "protected conduct" at issue. Heilig and Arp acknowledge that prisoners have generally have a First Amendment grievance right. Prisoners do not, however, have a protected right to violate

1

legitimate prison regulations, or a protected right to assert a frivolous grievance. Cantrell is guilty of both, and therefore was not engaged in protected conduct.

1. **There was nothing scattered across the floor of Cantrell's cell and video proves that. Any purported grievance on the condition of his cell would be frivolous.**

Cantrell claims that it is impossible to tell the condition of his cell from the Taser Video (R. 82-2, Defs.' Ex. C) because the video is dark, and the floor is painted and dark, and the video does not hover over to toilet. (R. 86, PgID 596). According to Cantrell, a "question of fact for the jury is created because the video is not clear whether the dark marking on the floor is from rubbed off paint or items gathered on the floor. (R. 86, PgID 597.)

In fact, the video proves to be quite clear. This is where Defendants are hopeful the court has access to a sharper screen than the government purchased laptops assigned to State employees, as Counsel for the Defense thought the same thing upon first review. However, once viewed on a screen of even moderate upgrade, the cleanliness of the floor is obvious. As such, the Court is encouraged to, if possible, review the taser video (Defs.' Ex. C) on the best screen available, turn up the video player brightness, and use the pause button. Defendants have also provided still photos of the same video. (R. 82-3 through 82-12, Defs.' Exs. E-N.)

Contrast what is visible on the Taser Video to what Cantrell is claiming. His brief refers to it as the "destruction of his belongings." (R. 86, PgID 596.) According to Cantrell, when he returned to the cell after it was searched by Heilig, he found that Heilig had "destroyed photographs of the Plaintiff's family members by ripping

2

them up and scattering them across the cell floor" and "removed all of the Plaintiff's clothing from his wall locker and left them strewn across the cell floor as well as in the cell toilet." (R. 40, PgID 155.) At deposition, Cantrell elaborated that, in addition to family pictures and clothing being thrown in the toilet and scattered on the floor, everything was pulled out his locker and placed on the floor, his bed and mattress was on the floor and his sheets were off the bed. (R. 78-2, Defs.' Ex. A at 9:4-9:10.) According to Cantrell, these items were scattered across his "**entire** cell floor." (*Id*. at 34:15.) Again, there is nothing on the floor.

As far as the toilet, the Court's attention is directed to the screen capture at Defendants' Exhibit N, and the timing of the Taser Video that "12" is visible in the lower right. (R. 82-12, Defs.' Ex. N; R. 83, Defs.' Ex. C.) Though the video doesn't "hover" directly over the toilet, certainly the physics of the toilet are such that it could only hold so much clothing, personal effects and torn up photos without *anything* sticking up beyond the shiny, silver rim. Like the floor, nothing at all is visible. Plaintiff is asking the Court to suspend logic relative to the finite nature of toilet volume, and to do so in spite of the fact that there is nothing on the floor either, let alone, scattered across the "entire floor." From Plaintiff's claims we should be looking for all his clothing, everything in his locker, and his torn-up photos being on the floor and in the toilet. (R. 40, PgID 155; R. 78-2, Defs.' Ex. A at 9:4-9:10.) Yet, nothing is visible. His claims are devoid of credibility.

Cantrell then argues that the "fact that Cantrell improperly left his cell during med line, shows that he was upset about something…[i]f there was truly

nothing wrong with his belongings…Cantrell would have been jeopardizing his place in protective custody for no reason at all…" (R. 86, PgID 597.) Heilig and Arp do not purport to know, and are not required to show, what Cantrell was thinking. The fact is, Cantrell is an incarcerated felon, convicted of two counts of Armed Robbery and a count of Felony Firearm,[1] who was mad and reeked of alcohol. (R. 78-17, Defs.' Ex. P; R. 78-3, Defs.' Ex. B at 11:11-11:13.) His decision-making process is anyone's guess. However, from the video showing that his cell and property was anything but "destroyed" and scattered across the "entire floor" it is far more logical that this claimed "protected conduct" is a convenient attempt at cover for whatever malfeasance he intended when he left his cell inappropriately.

In short, Cantrell's claim about the condition of his cell is a fabrication. In the unlikely event Cantrell truly wanted to grieve the condition of his cell, that complaint to a supervisor would be frivolous at best and not protected conduct.

### 2. **Cantrell was not engaged in protected conduct because he violated prison rules at the time he claims he was asking to speak to a supervisor.**

Cantrell argues that he "did not lose his right to engage in protected conduct because he was not disruptive" after he was removed from his cell and during the escort. (R. 86, PgID 597.) That period in time is not the issue. The issue is whether he violated legitimate prison regulations ***during*** the conduct that he now claims was protected. If he did, then the conduct is not protected. The Sixth Circuit has

---

[1] Michigan Department of Corrections, Offender Tracking Information System (OTIS) http://mdocweb.state.mi.us/otis2/otis2profile.aspx?mdocNumber=397429. Last accessed October 27, 2020.

held that "if a prisoner violates a legitimate prison regulation, he is not engaged in 'protected conduct,' and cannot proceed beyond step one." *Thaddeus-X v. Blatter*, 175 F.3d 378, 395 (6th Cir. 1999).

The issue, according to Cantrell himself, is whether Cantrell was "engaged in protected conduct when he asked multiple times to speak to a supervisor about Heilig destroying his belongings during a cell search." (R. 86, PgID 593.) Thus, that is the relevant period of claimed "protected conduct," not when he was being escorted to segregation for his actions. In his Brief, Cantrell concedes that he "improperly left his cell during med line…" (R. 86, PgID 597.) He affirmatively states that he "is not challenging the misconduct of disobeying a direct order…" (*Id.*) These are the things that Cantrell was doing, improperly leaving his cell and disobeying orders to return, *during* the time he claims he was trying to speak with a supervisor.

Cantrell is attempting to move the goal post by focusing on (his version of) what happened *after* he was led away for disobeying a direct order. Taking Cantrell's claims and admissions as true, he disobeyed a direct order when he improperly came out during med line to talk to a supervisor about the condition of his cell. (R. 86, PgID 593, 597.) Stated another way, he admits that he violated prison regulations *during the time* he claims to have been engaged in protected conduct. For that reason, he was not actually engaged in protected conduct. Even if Cantrell behaved during the escort, which Defendants deny, that does not cleanse his behavior at the time he improperly came out of his cell and disobeyed orders to

5

return.  Cantrell is specifically claiming that he disobeyed orders for the purpose of speaking to a supervisor.

While a prisoner may have a right to grieve prison officials, they cannot exercise that right in a manner that violates legitimate prison regulations or penological objectives. *Smith v. Campbell*, 250 F.3d 1032, 1037 (6th Cir. 2001). Cantrell admits that is what happened, he improperly came out at med line to try to speak to a supervisor about the condition of his cell and disobeyed orders to return. For the same reason, he was not engaged in protected conduct, and his retaliation claim fails.

As part of this argument, and at other times in his brief, Cantrell cites MDOC PD 03.03.105, arguing that Cantrell's placement in segregation for the disobeying a direct order ticket was contrary to MDOC policy. (R. 86, PgID 599, 614.) It is unclear the point he is trying to make.  Certainly, even if Cantrell is correct, there is no constitutional claim arising from failure to follow MDOC policy. *Laney v. Farley*, 501 F.3d 577, 581 n.2 (6th Cir. 2007.)  Likewise, there is certainly no constitutional obligation for MDOC to tolerate the behavior that that Cantrell has freely admitted leading up to his escort to segregation.  In addition to disobeying a direct order, which he admits, Cantrell was agitated and challenging the CO's to a fight. (R. 86-6, PgID 679 at 9:21.) He reeked of alcohol. (R. 78-3, Defs.' Ex. B at 11:11-11:13.)  Heilig and Arp were instructed to take Cantrell to segregation, they did not choose to. (R. 78-20, Defs.' Ex. S at 14:12.) Cantrell certainly could have asked Sgt. Stump at his deposition why that was ordered.

6

But the fact that there are no "special circumstances" listed in the disobeying direct order ticket is irrelevant. (R. 86, PgID 598.) The disobeying a direct order ticket and assault ticket were written only minutes apart, both after the events had already occurred, and, based on the times listed on the ticket, the assault ticket was reviewed by Lt. Gilbert before the disobeying a direct order. (R. 78-19, PgID 492, Defs.' Ex. R; R. 78-18, PgID 489, Defs.' Ex. Q.) Thus, at the time both tickets were written and reviewed, Cantrell was being held on a non-bondable assault. (*Id*.) Including additional "special circumstances" to the disobeying a direct order would be superfluous and Gilbert, as the reviewing officer for both, had that information. This repeated argument, whatever it is intended to mean, is putting form over substance.

3. **Cantrell claims he wanted to speak to a supervisor, but never spoke with Stump, who was the only supervisor.**

In addition to the legal reasons he was not engaged in protected conduct, there are significant factual gaps in Cantrell's claim that he wanted to speak to a supervisor about the condition of his cell. Among those is the fact that Stump, the only supervisor in the unit, was present when Cantrell was ordered out of his cell, and Cantrell knew he was there, but he never attempted to talk to Stump. (R. 78-3, Defs.' Ex. B. at 10:10, 11:11-11:13; R. 78-2, Defs.' Ex. A at 30:9-30:22, 30:24-30:25.)

To this, Cantrell claims that there is no requirement that he speak to a Sergeant since he verbally complained to Heilig. (R. 86, PgID 595.) While that may be true, the argument is factually disingenuous for Cantrell to make given his claims. Taking Cantrell's claims as true, he makes it abundantly clear that that

7

speaking to Heilig was not good enough for him. Cantrell's claim is that is "asked multiple times to speak to a supervisor…" (R. 86, PgID 593.) He claims that he knowingly violated prison rules by leaving his cell during med line "to attempt to speak with a shift commander…" (R. 86, PgID 595.) But then at his cell, as he's being handcuffed to be escorted to segregation, instead of addressing the only supervisor at the first possible opportunity, Cantrell chose only to defiantly tell the taser operator that "ain't no one scared of that taser bro…". (R. 83, Defs.' Ex. C.)

The reason that Cantrell never spoke to Stump is that he never wanted to speak to a supervisor at all at that time. That is because, as stated above, there was nothing wrong with his cell.

      B.    **Cantrell cannot establish causation for his claim of retaliation.**

Even if this Court finds that Cantrell was engaged in protected conduct, he cannot establish causation between the protected conduct and the claimed adverse actions. Cantrell relies entirely on the notion of "temporal proximity." (R. 86, PgID 601.) While it is conceded that, by Cantrell's claims, the action of asking to speak to a supervisor (his claimed protected conduct) was close in time to Cantrell being taken to the ground and issued a misconduct ticket, Cantrell's intervening actions of disobeying a direct order broke any chain of causation.

Cantrell has the burden of proving all three elements of his retaliation claim. It is not enough for Cantrell to show that a defendant acted with a retaliatory motive and that he was injured—the motive must cause the injury. *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019). "Specifically, [the retaliatory motive] must be

a "but-for" cause, meaning that the adverse action against the plaintiff would not have been taken absent the retaliatory motive." *Id.*

Taking Cantrell's claims as true, he insisted on speaking to a supervisor without anything more happening to him than being ignored and/or cursed at by Heilig. (R. 78-2, Defs.' Ex. A at 10:7-10:15, 12:16-12:23.) Heilig told him to "lock your punk ass down." (R. 40, PgID 155.) Cantrell was removed from his cell for disobeying a direct order, not for asking to speak to a supervisor. Cantrell does not dispute that he disobeyed a direct order and was guilty of that. (R. 86, PgID 597.)

Simply put, had Cantrell not disobeyed a direct order, he never would have been escorted down the stairs, never would have been taken to the ground, and never would have been issued a misconduct ticket. There was never a reason to remove Cantrell from his cell until he refused to lock down. It was unprotected conduct of disobeying a direct order that set this in motion. There is zero evidence that, had Cantrell not disobeyed orders, that anything further would have happened. Therefore, Cantrell cannot show "but-for" causation.

    **1. Plaintiff's retaliation claim against Arp is, at best, total speculation.**

As to Arp's involvement in the claimed retaliatory excessive force, it is true, as Cantrell points out, that Arp is the one who caused Cantrell to go to the ground. (R. 86, PgID 602.) What Cantrell cannot show is that Arp's action was in retaliation for his claimed protected conduct – asking to speak to a supervisor about Heilig's cell search. Cantrell cannot show that Arp knew that Cantrell wanted to speak to a supervisor about Heilig's cell search. The Sixth Circuit has held that "[t]he

9

defendant must have known about the protected activity in order for it to have motivated the adverse action." *Hamilton v. Starcom Mediavest, Inc.,* 522 F.3d 623, 628 (6th Cir. 2008) (quoting *Thaddeus-X v. Blatter*, 175 F.3d 378, 387 n.3 (6th Cir. 1999)). Beyond his speculation and conspiracy theory, Cantrell cannot show that Arp knew about Cantrell's purported complaint against Heilig. In fact, Cantrell testified that his claim of Arp's involvement in the alleged retaliation was a belief. (R. 78-2, Defs.' Ex. A, 27:21-28:5.)

As for the misconduct ticket, there is simply no evidence that Arp was involved at all in a misconduct written and signed by Heilig. (R. 78-19, Defs.' Ex. R.) Although Cantrell claims that Arp "was personally involved in supporting the fabricated charged" (R. 86, PgID 604) he puts forth no evidence that it true. The Hearing Officer notes on multiple occasions that **no** witness statements were provided for the hearing. (R. 78-19, PgID 492, Defs.' Ex. R.) That means she had no witness statement from Arp. Arp is not even mentioned in the hearing report and, in fact, the Hearing Officer appears to not even know who Arp is, writing "one of the unknown officers trips Cantrell…" (*Id.*) Arp's involvement in this claimed "retaliation" is nothing more than speculation.

### 2. There is a nonretaliatory basis for every action complained of by Cantrell.

In their brief in support of their motion for summary judgment, Heilig and Arp outline why Cantrell was taken to the ground during the escort and Heilig outlines why he issued Cantrell the complained-of misconduct ticket. (R. 78, PgID 394-396.) Cantrell's counter to that, as is his response to most everything in this

10

case, is that he was found not guilty of the misconduct ticket that was written by Heilig. (R. 86, PgID 604). Since Cantrell will not examine the full basis of the Hearing Officer's finding, Heilig and Arp will.

First off, the hearing officer states she reviewed "a video." (R. 78-19, PgID 491.) Not multiple videos, as have been presented in this case. (R. 83, Defs.' Ex. C; Defs.' Ex. T.) The Hearing Officer reviewed the misconduct report, which is a handwritten paragraph by Heilig – essentially the initial complaint. (R. 78-19, PgID 491.) The Hearing Officer reviewed the Hearing Investigation Report, which contains only a statement of Cantrell offered in his own defense. (*Id.* at PgID 493.) No witnesses testified, and there were no witness statements provided. (*Id.* at PgID 494.) The other witnesses were not even listed in the misconduct report. (*Id.*)

In the end, the Hearing Officer watched one of the two videos, reviewed Cantrell's version of events, and made her finding. (*Id.* at 491.) Even in making that finding, the Hearing Officer notes:

> The video shows the reporter lose his footing, but it is not clear that the prisoner at any time tenses up. Prisoner's explanation of the event, that he was just going with the motion, is also consistent with the video. Three other staff members were present, but their statements were not submitted to determine the veracity of the reporter or the prisoner. **Without such statements of verification, I am not convinced the prisoner physically resisted or interfered with an employee.**

(*Id.* at 491.) The Hearing Officer ultimately made her decision based on a single video augmented with Cantrell's self-serving statement. In doing so, the Hearing Officer specifically acknowledged the need for witness statements to make a determination. There is little doubt that the facts in support of the misconduct

11

ticket issued by Heilig were poorly investigated and even more poorly presented at the hearing. Cantrell got the benefit of that, being found not guilty and facing no repercussion. It is not surprising that he now seeks to bootstrap the lack of investigation in a fifteen minute prison hearing into a win in federal court on a § 1983 claim where both sides are represented by counsel and have conducted five depositions and over 1000 documents worth of discovery.

Unlike the lack of evidence at Cantrell's misconduct hearing, in support of their motion, Heilig and Arp have provided sworn deposition testimony stating the basis for their actions. (R. 78-5, Defs.' Ex. D; R. 78-20, Defs.' Ex. S.) They have presented the Taser Video showing Heilig and Arp working to get a grip of Cantrell while going down the stairs. (R. 83, Defs.' Ex. C.) They have presented the Internal Affairs investigation report, along with an affidavit of the writer of the report identifying it as a business record. (R. 78-17, PgID 479-486.) Unlike Cantrell's misconduct hearing, the reason that Cantrell was issued a misconduct ticket and taken to the ground for resisting is adequately in the record.

Cantrell then asks that this court afford the Hearing Officer's finding a "preclusive effect." (R. 86, PgID 605.) This is the same argument that Cantrell makes in his motion for summary judgment on the issue of liability. (R. 88.) As will be further discussed in Heilig and Arp's response to Cantrell's motion, the Hearing Officer's findings do not have a preclusive effect because Heilig and Arp, the parties that would be precluded, did not have an adequate opportunity or any incentive to obtain a full and fair adjudication of these facts during the misconduct hearing.

*Roberson v. Torres*, 770 F.3d 398 (6th Cir. 2014). As stated above, the Hearing Officer watched one of the two videos, reviewed Cantrell's version of events, and made her finding. (R. 78-19, PgID 491.)

As to the retaliation claim, Heilig and Arp have provided more than mere denials of Cantrell's allegations. Cantrell, on the other hand, has countered with nothing more that the findings of a Hearing Officer who watched a video and considered only Cantrell's statement.

## II. Heilig and Arp acted reasonably to restore discipline when Cantrell resisted being escorted to segregation.

Cantrell claims that he did not resist while being escorted to segregation. (R. 86, PgID 608.) It is unsurprising that Cantrell again relies on the Hearing Officer's findings to conclude that Heilig and Arp's claims were "false and discredited." (*Id.* at 609.) At this point, the reasons underlying the Hearing Officer's decision, and the lack of evidence at that hearing, are adequately in the record as stated above, and as stated in the Hearing Report itself (R. 78-19, Defs.' Ex. R).

Where the Hearing Officer lacked written statements, Heilig and Arp have provided deposition testimony regarding the reasons that Cantrell was taken to the ground. They used the force used the force necessary to gain compliance from an angry, resisting prisoner. (R. 78-5, Defs.' Ex. D at 23:7-23:25.) They began to lose control of the escort when Cantrell bumped Heilig. (*Id.* at 21:16-21:25.) Cantrell then resisted Heilig's efforts to get Cantrell into a better position for escort. (*Id.* at 22:9-23:16). Cantrell continued to resist by tensing up his body and pinning his arms to his ribs. (*Id.* at 23:13). This is corroborated by the Taser Video, which

13

shows Heilig and Arp working to try to get a grip on Cantrell as they descend the stairs. (R. 83, Defs.' Ex. C.) Again, this is evidence and statements that the hearing officer did not have.

On Cantrell's other arm, Arp is blindly reacting to the bump against Heilig. (R. 78-20, Defs.' Ex. S at 13:8-13:14.) He is working to control Cantrell, but Cantrell "was not having it." (*Id*.) His testimony corroborates what can be seen on the Taser Video relative to their efforts to get a grip on Cantrell while on the stairs. (R. 83, Defs.' Ex. C.) And note, it is Arp that took Cantrell to the ground, not Heilig. (R. 78-20, Defs.' Ex. S at 13:13.) Arp was not a part of the cell search that Cantrell purports to be complaining about. (R. 78-2, Defs.' Ex. A at 19:7, 28:18.) Arp did not know why Cantrell was being taken to segregation, he just knew that he needed to be taken. (R. 78-20, Defs.' Ex. S at 14:14-14:17.) Arp was not even a bystander to anything that happened before. The fact that Arp, based on what was happening on the stairs, felt the need to take Cantrell to the ground to get control is telling. Cantrell's version is that the "protected conduct (asking to speak to a supervisor) and the adverse actions ('assault' and misconduct) were connected as one sequence of events." (R. 86, PgID 601.) If there was some conspiracy between Heilig and Arp to "assault" Cantrell on the stairs by fabricating that Cantrell resisted, which is what Cantrell is now arguing, when was that conspiracy hatched during this "one sequence of events"?

Heilig and Arp have established that they applied force in good faith for the purpose of keeping order. *Hudson v. McMillan*, 503 U.S. 1, 6-7 (1992). Even in

14

doing so, let us look at what they, Heilig and Arp, actually did. Arp took Cantrell to the ground and Heilig held onto him while on the ground. (R. 83, Defs.' Ex. T.) Though Cantrell claims that "(s)everal people jumped on top of him causing his face, neck, and feet to be smashed into the ground…(and he) was hit in his side, neck, back, legs and arms" (R. 86. PgID 580), no punches or strikes appear on facility surveillance video. (R. 83, Defs.' Ex. T.) Even if there were, Heilig and Arp are the only ones being sued, not the remaining "several people." At best, his claims against Heilig and Arp sound in tort, not in the Eighth Amendment, which requires more than a simple assault and battery. (R. 78, PgID 402.)

## CONCLUSION AND RELIEF REQUESTED

MDOC Defendants request this Honorable Court to grant their motion for summary judgment and qualified immunity and dismiss this case with prejudice.

Respectfully submitted,

Dana Nessel
Attorney General

*s/ Josh Marcum*
Josh Marcum (P68244)
Assistant Attorney General
Attorney for MDOC Defendants
MDOC Division
P.O. Box 30217
Lansing, MI  48909
(517) 335-3055
marcumj1@michigan.gov

Date:  November 9, 2020    P68244
Marcum\Cantrell 2018-0238395-B\Reply Brief

**CERTIFICATE OF SERVICE**

I hereby certify that on **November 9, 2020**, I electronically filed **MDOC DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT,** with the Clerk of the Court using the ECF system which will send notification of such filing.

*s/ Josh Marcum*
JOSH MARCUM (P68244)
Assistant Attorney General
marcumj1@michigan.gov
P68244

**CERTIFICATE OF COMPLIANCE**

Certificate of Compliance with Type-Volume Limit, Typeface Requirements, and Type Style Requirements

1. This brief complies with the type-volume limitation of Local Civil Procedure Rule 7.3(c), because, excluding the part of the document exempted by Local Civil Procedure Rule 7.2(c), this brief contains no more than 4,300 words. This document contains **4044** words as counted by Microsoft Word Version 2007.

2. This document complies with the typeface requirements of Local Civil Procedure Rules and the type-style requirements of Local Civil Procedure Rules because this document has been prepared in a proportionally spaced typeface generated by Microsoft Word Version 2007 in 12-point Century Schoolbook.

*s/ Josh Marcum*
Josh Marcum (P68244)
Assistant Attorney General
marcumj1@michigan.gov
P68244